**Alvin McDANIEL, Appellant**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2012–SC–000564–MR.

Supreme Court of Kentucky.

Dec. 19, 2013.

---

**32.** *See, e.g., Shoney's,* 875 S.W.2d 514.

John Gerhart Landon, Molly Mattingly, Assistant Public Advocate, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, Bryan Darwin Morrow, Assistant Attorney General, Counsel for Appellee.

Opinion of the Court by Justice SCOTT.

A Kenton Circuit Court jury found Appellant, Alvin McDaniel, guilty of two counts of first-degree assault and of being a second-degree persistent felony offender (PFO). As a result, Appellant was sentenced to twenty-five years' imprisonment. He now appeals as a matter of right, Ky. Const. § 110(2)(b), asserting that (1) the trial court erred in failing to strike three prospective jurors for cause, (2) the trial court erred in failing to provide limiting instructions to witness testimony, (3) the trial court erred in allowing the expert opinions of a witness not identified as an expert, (4) the Commonwealth improperly admitted evidence of other crimes, and (5) his right to due process was violated when he was convicted of first-degree assault after the Commonwealth failed to prove one of his victims suffered a "serious physical injury." For the following reasons, we affirm one of Appellant's convictions for first-degree assault, reverse the other, and remand the case to the trial court for further proceedings in accordance with this Opinion.

## I. BACKGROUND

Appellant's convictions arose from an altercation in which he shot Boysie Washington and Tanya Henderson. On the day in question, Washington and Henderson's twelve-year-old daughter, Jane,[1] got into a fight at school with Sally, the thirteen-year-old daughter of Iris Jennings (Appellant's girlfriend). Following the fight, Sally went to her grandmother's house to watch television. After Washington and Henderson learned Jane had been in a fight at school, they went out in search of Sally. This led them to knock on Sally's grandmother's door, which Sally answered. Washington then induced Sally into the street to fight Jane again in order to settle the girls' rift from school. Washington, Henderson, and several other neighborhood spectators watched the fight in the street.

When Appellant learned of the street fight, he was angered by Washington's provocation of the altercation and drove the streets looking for Washington. Upon locating Washington, Appellant exited his vehicle and approached him with a pistol. After a heated exchange, Appellant fired multiple shots, hitting Washington in the torso, thigh, and arm, and striking Henderson in the wrist.

1. We have changed the names of the two minors in this opinion.

Following the shooting, Appellant was indicted by a Kenton County Grand Jury for first-degree assault of Washington, first-degree assault of Henderson, and second-degree PFO. The case proceeded to a jury trial, and the jury returned a verdict finding Appellant guilty of intentional first-degree assault of Washington and wanton first-degree assault of Henderson. The jury initially sentenced Appellant to twenty years' imprisonment for first-degree assault of Washington and ten years' imprisonment for first-degree assault of Henderson. After the Commonwealth presented evidence establishing Appellant's prior convictions, the jury also found Appellant to be a second-degree PFO and recommended that his sentence be enhanced to twenty years for each assault to be served consecutively for a total of forty years' imprisonment. At final sentencing, the trial court departed from the jury's recommendation, reducing the total sentence to twenty-five years.

## II. ANALYSIS

### A. The Trial Court Did Not Commit Reversible Error by Failing to Strike Three Prospective Jurors for Cause

Appellant first argues that the trial court committed reversible error when it failed to strike three prospective jurors for cause. Specifically, Appellant asserts that the trial court's error forced him to unnecessarily expend three peremptory strikes on jurors who should have been struck for cause, and that this forfeiture of peremptory strikes amounted to a violation of his right to be tried by a fair and impartial jury.

 Appellant concedes that he failed to properly preserve the issue but requests our review for palpable error under RCr 10.26; KRE 103. Under the palpable error standard, an unpreserved error may be noticed on appeal only if the error is "pal-

pable" and "affects the substantial rights of a party," and even then relief is appropriate only "upon a determination that manifest injustice has resulted from the error." RCr 10.26. "[W]hat a palpable error analysis 'boils down to' is whether the reviewing court believes there is a 'substantial possibility' that the result in the case would have been different without the error." *Brewer v. Commonwealth,* 206 S.W.3d 343, 349 (Ky.2006) (citations omitted).

 Appellant alleges that the trial court should have excluded jurors 63, 94, and 120 because each of them indicated in voir dire that they would give greater weight to a police officer's testimony than a layperson's. A thorough examination of the alleged biases of the three prospective jurors is unnecessary because each juror was eventually peremptorily struck by Appellant; therefore, there is not a "substantial possibility" that these particular jurors' biases affected the result in the case as is required for a finding of palpable error. *Id.* The erroneous deprivation of a peremptory challenge can only affect the result of a case if another juror the defendant would have used a peremptory strike on is impaneled to the jury. *See Gabbard,* 297 S.W.3d at 854 (citing *King v. Commonwealth,* 276 S.W.3d 270, 279 (Ky.2009)) (explaining that a trial court's erroneous failure to grant a strike for cause is non-prejudicial if no other juror the defendant would have used a strike on actually sits on the jury). If Appellant does not both exhaust his peremptory strikes and assert that he would have used one of his forfeited peremptory strikes on another prospective juror who actually sat on the jury, "there can be no reversible error because the 'Appellant received the jury he wanted,' and any error [was] 'effectively cured.'" *Id.* Because Appellant has failed to assert that he would have peremptorily

**650**

struck another prospective juror, this issue was not preserved; and because none of the challenged jurors sat on the jury there is no basis for a finding of palpable error.

## B. The Trial Court Did Not Commit Reversible Error by Failing to Provide Limiting Instructions

Appellant next argues that the trial court committed reversible error by failing to instruct the jury that certain portions of testimony could only be considered for a limited purpose. Specifically, Appellant claims the trial court should have instructed the jury that portions of Washington's and Detective Corey Warner's testimony referencing retaliation could only be considered for the limited purpose of explaining Washington's prior inconsistent statements.

### 1. Testimony of Washington

During direct examination by the Commonwealth, Washington identified Appellant as the person who shot him. The assuredness of Washington's identification of Appellant contrasted with his previously expressed lack of certainty at a photographic lineup conducted just a few days after the shooting. In order to defuse Appellant's anticipated impeachment of Washington based on the uncertainty of his earlier identification, the Commonwealth, while still on direct, questioned Washington about his prior inconsistent statements during the lineup. Washington admitted that his statements during the lineup were inconsistent with his more assured identification of Appellant at trial. The Commonwealth then attempted to anticipatorily rehabilitate Washington's cred-

ibility by eliciting testimony from him that the uncertainty expressed during the photographic lineup was rooted in a fear of retaliation:

> Washington: At the time, I told him I was sixty-five to seventy percent sure, not one hundred percent. My reason of that was because I didn't want to be in this position that I'm in right now, sitting up here.
>
> Commonwealth: Boysie, why did you not want to be in the position of being a witness against somebody that shot you? Why is that?
>
> Washington: I've been to prison. I've been dealing the streets. It ain't safe out here doing this.

Appellant claims that the trial court's admission of this testimony without an admonition to the jury that the testimony could only be considered for the limited purpose of explaining Washington's prior inconsistent statements constitutes reversible error. However, admonitions restricting the scope of admissible evidence are available only "upon request." KRE 105(a);[2] *Ernst v. Commonwealth*, 160 S.W.3d 744, 759 (Ky.2005). Appellant failed to request such an admonition, and thus, the trial court did not commit reversible error by not providing one. *Id.* at 760. Nonetheless, when Appellant requests palpable error review under RCr 10.26, KRE 105(a) dictates that we still must review the admission of the underlying evidence for palpable error. *See id.*

■ Ordinarily, a witness's statement that he fears retaliation for testifying is improper. *See Parker v. Commonwealth,*

---

**2.** KRE 105(a) provides:
 When evidence which is admissible as to one (1) party or for one (1) purpose but not admissible as to another party or for another purpose is admitted, the court, *upon request*, shall restrict the evidence to its proper scope and admonish the jury ac-

cordingly. In the absence of such a request, the admission of the evidence by the trial judge without limitation shall not be a ground for complaint on appeal, except under the palpable error rule.
(Emphasis added.)

291 S.W.3d 647, 658 (Ky.2009) ("Jury verdicts must be based upon admissible evidence, not juror's fear of the allegedly vengeful nature of a defendant."). However, in this instance, the trial judge determined that Washington's comments were admissible because they helped explain his prior inconsistent statements as to the level of certainty of his identification of Appellant.

■ The only portion of Washington's testimony that arguably references retaliation is his comment, "[i]t ain't safe out here doing this." As previously mentioned, in *Parker*, this Court held that threat evidence is improper when it invites the jury to render a verdict based on the vengeful nature of the defendant rather than the established arguments and facts of the case. *Parker*, 291 S.W.3d at 658. Essentially, the rule of *Parker* is that evidence of threats is not admissible to prove a violent or vengeful propensity. *Parker*'s holding tracks KRE 404(b)'s prohibition against evidence of other crimes when offered to "prove the character of a person in order to show action in conformity therewith." However, *Parker* is distinguishable from the present case because, in *Parker*, the Commonwealth did not argue that the retaliation-referencing testimony was admissible for any other valid purpose. *Id.* Here, the Commonwealth points us to the trial judge's explanation that Washington's testimony was admissible to explain his prior inconsistent statements.

■ Although we have never specifically considered whether threat evidence may be admissible if offered for a purpose other than proving a vengeful propensity, other courts have found that it is admissible if relevant to explain a witness's inconsistent statements. *See, e.g., United States v.*

*Thadsamany*, 305 Fed.Appx. 942, 944 (4th Cir.1997) (citation omitted); *United States v. Thomas*, 86 F.3d 647, 654 (7th Cir.1996), *cert. denied*, 519 *U.S.* 967, 117 S.Ct. 392, 136 L.Ed.2d 307 (1996); *Brown v. United States*, 952 A.2d 942, 947 (D.C.2008) (citation omitted); *State v. Mayhorn*, 720 N.W.2d 776, 783 (Minn.2006) (citation omitted); *see also United States v. Qamar*, 671 F.2d 732, 734–36 (2d Cir.1982) (explaining that threat evidence is admissible when it aids in determining the credibility of witnesses). Today we join these courts in holding that threat evidence may be admitted if it serves to aid the jury in resolving a witness credibility issue.[3]

■ The central issue when threat evidence is sought to be introduced is the balance of probativeness and prejudice required by KRE 403. As our holding in *Parker* acknowledges, the potential prejudice from threat evidence may be great. However, in this case, the possibility of prejudice was lessened by the non-specific nature of Washington's fear of retaliation. Washington never implicated the Appellant as the source of his fear of retaliation, rather he stated that this fear was born of his past experiences and time spent in prison. Because the possibility of prejudice from Washington's testimony was negligible, we conclude that the admission of the testimony did not rise to the level of palpable error. RCr 10.26.

### 2. Testimony of Detective Warner

Similar to his argument against the admissibility of the testimony of Washington, Appellant asserts that the trial court committed reversible error by failing to admonish the jury that Detective Warner's testimony could only be considered for the purpose of explaining Washington's prior inconsistent statements. Furthermore,

---

**3.** This ruling comports with KRE 404(b)(1), which allows evidence of other crimes "if offered for some other purpose" other than to prove propensity.

Appellant asserts that Warner's testimony was inadmissible hearsay and that it improperly bolstered Washington's testimony. This issue was not properly preserved; however, Appellant has requested review under RCr 10.26, so we will review the admission of Warner's testimony under the palpable error standard. RCr 10.26; KRE 103.

Appellant takes issue with the following colloquy between the prosecutor and Warner:

> Commonwealth: Now, tell the members of the jury, how his identification went.
>
> Warner: Mr. Washington, Boysie Washington, identified number five, however, he stated he could not be one hundred percent. He gave a numeric of sixty-five to seventy percent. He feared retaliation is what he said in the interview.
>
> Commonwealth: Did you have doubts about that?
>
> Warner: Doubts about what sir?
>
> Commonwealth: About his assuredness of the identification.
>
> Warner: I was pretty sure he knew who the person was.
>
> Commonwealth: Why?
>
> Warner: Just based on my discussion with him outside the interview room prior and the fact that he was, uh, he didn't want to actually sign the sheet that was provided in this—he appeared to fear what may be the repercussion from this.

Following this exchange, Appellant's counsel objected. The trial judge overruled the objection, but the prosecutor declined to question Warner further.

#### a. Investigative Hearsay

■ First, Appellant claims that Warner's testimony contained inadmissible "investigative hearsay." Specifically, Appel-

lant points to Warner's statement that Washington "feared retaliation." Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." KRE 801(c). Appellant argues that "investigative hearsay" is a distinct subcategory of hearsay that applies specifically to investigating officers. According to Appellant, any out-of-court statement made to an investigative officer is admissible only when introduced to explain "why a police officer took certain actions." *Chestnut v. Commonwealth,* 250 S.W.3d 288, 294 (Ky.2008) (citing *Young v. Commonwealth,* 50 S.W.3d 148, 167 (Ky.2001)). Because Warner's testimony regarding Washington's comments and behavior at the line up was not admitted for the purpose of explaining any particular action taken by Warner, Appellant argues it was inadmissible "investigative hearsay."

Appellant's argument fundamentally misinterprets the concept of investigative hearsay. This Court has stated that "investigative hearsay" is a "misnomer ... derived from an attempt to create a hearsay exception permitting *law enforcement officers* to testify to the results of their investigations." *Nall v. Commonwealth,* No. 2007–SC–000189–MR, 2008 WL 5051584, at *4 n. 8 (Ky. Nov. 26, 2008). This erroneous basis for the admission of hearsay evidence was rejected in a line of cases beginning with *Sanborn v. Commonwealth,* 754 S.W.2d 534 (Ky.1988).[4]

As previously mentioned, Appellant asserts that "investigative hearsay" is something entirely different—a rule that information provided to an investigating officer is admissible at trial only when it helps explain the action that was taken by the

---

4. The plurality holding of *Sanborn* was accepted by a majority of this Court and rendered binding precedent in *Brewer,* 206 S.W.3d at 351.

police officer as a result of the information. Appellant's argument is founded on a selective quotation of *Sanborn,* specifically a passage which states, "The rule is that a police officer may testify about information furnished to him only where it tends to explain the action that was taken by the police officer as a result of this information *and* the taking of that action is an issue in the case." *Sanborn,* 754 S.W.2d at 541.

■ However, a more thorough reading of *Sanborn* reveals that the above-quoted limitation on the admissibility of information furnished to a police officer applies only when the testimony of a police officer is offered as nonhearsay under the verbal acts doctrine. *Id.* The verbal acts doctrine provides that testimony is nonhearsay when it is "not admitted for the purpose of proving the truth of what was said, but for the purpose of describing the relevant details of what took place." *Id.* (citation omitted).

■ In the present case, we need not consider whether Warner's description of the testimony of Washington meets the requirements of *Sanborn* because it shows that he was in a state of fear, and thus, is independently admissible under the hearsay exception for then-existing state of mind. KRE 803(3). Prior cases illustrate that hearsay testimony meeting a hearsay exception is admissible despite the fact that the testimony was elicited during an investigation. *See Nall,* 2008 WL 5051584, at *5; *Tucker v. Commonwealth,* No. 2004–SC–0411–MR, 2005 WL 2318955, at *3 (Ky. Sept. 22, 2005) (explaining that alleged "investigative hearsay" testimony of police officer was admissible under KRE 801A(a)(2)'s hearsay exception to rebut a charge of recent fabrication).

### b. Bolstering

■ Appellant also asserts that Warner was erroneously permitted to vouch for the credibility of Washington. "Generally, a witness may not vouch for the truthfulness of another witness." *Stringer v. Commonwealth,* 956 S.W.2d 883, 888 (Ky. 1997). Especially troubling is Warner's statement that he knew Washington "was pretty sure he knew who the person was." Although Warner did not specifically vouch for the credibility of Washington's testimony on the stand by saying that Washington was telling the truth in court, Warner's testimony was still improper because he gave lay opinion testimony as to what another witness meant by what he said out of court. *Tamme v. Commonwealth,* 973 S.W.2d 13, 34–35 (Ky.1988); *see also Thacker v. Commonwealth,* No. 2004–SC–000517–MR, 2005 WL 2675001, at *10 (Ky. Oct. 20, 2005) (holding it was improper for witness to testify she thought Appellant was lying to her during out-of-court statement).

■ Although admission of Warner's testimony as to the untruthfulness of Washington's out-of-court statements was erroneous, we do not find that it amounts to palpable error. Defense counsel focused its case on a defense of extreme emotional disturbance. Ultimately, the identification of Appellant as the shooter became a non-issue as Appellant took the stand and admitted he was the shooter. As previously explained, those portions of Washington's testimony, recanted here by Warner, that mention fear of retaliation are general in nature and do not point to Appellant as the source of the fear, thus minimizing the possibility that the jury would base its verdict on its fear of Appellant rather than the facts of the case. Although Warner's testimony was admitted in error, we do not find a "substantial possibility" that the result in the case would have been different absent this testimony. *Brewer,* 206 S.W.3d at 349. Thus, we find no resulting palpable error.

## C. The Trial Court Did Not Commit Reversible Error When It Allowed a Fact Witness to Present an Expert Opinion

Appellant next asserts that the trial court improperly treated Dr. Anthony Borzada as a "fact witness" yet allowed him to testify to matters as an "expert witness." Specifically, Appellant alleges that it was reversible error to designate Dr. Borzada as a "fact witness" but still allow him to testify about his qualifications, why he chose to perform surgery on Washington, and the amount of pain Washington endured as a result of the surgical procedure.

### 1. Testimony as to Qualifications

■ Appellant's first issue with the testimony of Dr. Borzada is that the doctor was allowed to briefly testify to his education and training experience. Appellant claims that, if Dr. Borzada was testifying as a lay witness, he should not have been allowed to testify as to his qualifications.

■ Appellant does not cite any cases holding that a lay witness may not answer questions about his background. Obviously, background information is relevant to jurors in that it aids in assessing the credibility of fact witnesses and in determining the weight to give their testimony—questions within the unique province of the jury. *See Hatfield v. Commonwealth*, 250 S.W.3d 590, 596 (Ky.2008) (citation omitted) ("It is the job of the jury to evaluate the credibility of witnesses and lend to that evaluation the relative weight they deem fit."). Whether Dr. Borzada was testifying as a lay witness or as an expert, there was nothing inappropriate with the Commonwealth establishing his credibility by inquiring into his background. We find no error in Dr. Borzada briefly explaining to the jury where he earned his degrees and performed his residency. This background information aids the jury by putting Dr. Borzada's role in the treatment of Washington's injuries into context.

### 2. Expert Opinion Testimony

Appellant also claims that it was error for Dr. Borzada to offer his opinions on two different topics during the trial, which Appellant claims constituted "expert opinions." First, the Commonwealth asked Dr. Borzada what would have happened if he had not provided Washington with surgical care. Appellant objected and the Commonwealth rephrased the question, this time asking Dr. Borzada if he would unnecessarily perform surgery. Second, Dr. Borzada provided testimony on the amount of pain endured by Washington. This included testimony on the pain of the procedures performed, the length of time before the pain would subside, and what type of medications would be prescribed. Appellant is correct that both of these questions went to the prognosis of Washington and called for the "expert opinion" of Dr. Borzada. Appellant asserts that allowing Dr. Borzada's testimony on these matters violated KRE 701(c), KRE 702, and RCr 7.24(1)(c).

### 1. KRE 701 and KRE 702

KRE 701(c) prohibits a lay witness from testifying on matters "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." The Evidence Rules Review Commission Notes regarding KRE 701 indicate that subsection (c) is specifically intended to combat the possibility of counsel avoiding the reliability standards set out in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) "by the simple process of offering 'scientific, technical, or other specialized knowledge' evidence through a witness that an attorney sought to identify as a 'lay witness.' "

In the present case, although the Commonwealth specifically identified Dr. Bor-

zada as a "fact witness" and fought to preserve his status as such, it did not attempt to avoid the reliability standards of *Daubert*. As previously mentioned, Dr. Borzada testified to his education and training, including his certification by the American Board of Surgery. In order to satisfy *Daubert*, as codified in KRE 702, a witness must be qualified by "knowledge, skill, experience, training, or education." Nonetheless, Appellant asserts that because the trial court did not formally certify Dr. Borzada as an expert, he was not qualified to speak to expert matters.

 "The decision to qualify a witness as an expert rests in the sound discretion of the trial court." *Kemper v. Gordon*, 272 S.W.3d 146, 154 (Ky.2008) (citation omitted). Furthermore, "[A] trial court has wide latitude in deciding *how* to test an expert's reliability and in deciding whether or when special briefing or other proceedings, *i.e.*, at a *Daubert* hearing, is needed to investigate reliability." *Dixon v. Commonwealth*, 149 S.W.3d 426, 430 (Ky.2004) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). "Formal *Daubert* hearings are not always required." *Id.*

 We find that Dr. Borzada's testimony regarding his background provided a sufficient basis for the trial court to find that he had the necessary expertise to testify on the necessity of surgery and the amount of pain suffered by Washington. Therefore, we find no violation of KRE 702's requirement that an expert witness must be qualified. Furthermore, we find no violation of KRE 701 because the evil that this rule seeks to avoid, the introduction of unreliable expert opinions through a lay witness, was prevented by Dr. Borzada's qualification pursuant to KRE 702.

#### 2. *RCr 7.24(1)(c)*

 Having determined that Dr. Borzada's testimony did not violate KRE 701(c) or 702, we now turn to Appellant's allegation that the trial court erred in allowing the Commonwealth to skirt the requirements of RCr 7.24(1)(c), which requires the Commonwealth to provide certain discovery materials relating to expert witnesses to the defense upon written request, by designating Dr. Borzada as a "fact witness" yet allowing him to provide expert medical opinions. After a thorough review of the trial court's treatment of Dr. Borzada, we find that Appellant's argument has merit.

Prior to trial, the trial judge postulated that Dr. Borzada could testify as a "fact witness" so long as he only testified to his actions in treating Washington. This allowed the Commonwealth to avoid providing the Appellant with a written summary "describ[ing] the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications" as required by RCr 7.24(1)(c). At trial, the Commonwealth stated that its reason for not turning over medical records to the defense was that Dr. Borzada was only being called as a "fact witness." Despite its determination that Dr. Borzada was to testify only as a "fact witness," the trial court subsequently allowed him to offer expert medical opinions, as explained above.

 The standard of review for a trial court's evidentiary rulings is abuse of discretion. *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky. 2000). The test for abuse of discretion is "whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999).

In the present case, the trial court allowed the Commonwealth to have their

cake and eat it too by permitting the Commonwealth to skirt providing discovery under RCr 7.24(1)(c) by designating Dr. Borzada a "fact witness" and subsequently letting him render expert opinions on the stand. "A cat and mouse game whereby the Commonwealth is permitted to withhold important information requested by the accused cannot be countenanced." *James v. Commonwealth,* 482 S.W.2d 92, 92 (Ky.1972). We hold that the approach of the trial court in this instance was markedly unfair, and it constituted an abuse of discretion. *English,* 993 S.W.2d at 945. This Court is not in approval of this procedure. We now must address whether the error was harmless. RCr 9.24.

RCr 9.24 provides that harmless error is "any error or defect in the proceeding that does not affect the substantial rights of the parties." A reviewing court should ask "whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Winstead v. Commonwealth,* 283 S.W.3d 678, 689 (Ky.2009) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

Turning to the two expert opinions improperly given by Dr. Borzada, prior to the first, the trial judge properly sustained the defense's objection to the Commonwealth's question of what would have happened to Washington without surgery. The Commonwealth's rephrasing of the question, this time asking whether Dr. Borzada performs surgery unnecessarily, was far less likely to create prejudice because the inference that Washington needed surgery would have been apparent to the jury when Dr. Borzada testified that he did in fact perform several procedures on Appellant. Furthermore, the expert opinion of Dr. Borzada oh prognosis was not particularly harsh—he testified that a

person with Washington's injuries would take a "couple of weeks" before the pain would settle down and would require medication until that time.

Even when acting as a "fact witness," Dr. Borzada could still testify to Washington's condition upon arrival at the hospital because it was a matter within Dr. Borzada's personal knowledge. KRE 602. Dr. Borzada's admissible testimony revealed that Washington suffered from three gunshot wounds, the most serious of which went through his chest and abdomen. Dr. Borzada also testified to having to insert a tube in Washington's chest to prevent the collapse of his lung. Washington himself testified to being shot multiple times, not being able to eat for days, losing feeling in his legs, and the scars that remain from the bullets. The admissible portion of Dr. Borzada's testimony, as well as Washington's own testimony, provided ample evidence of the seriousness of Washington's injuries. Therefore, Dr. Borzada's improper expert opinions could not have substantially influenced the case. *Winstead,* 283 S.W.3d at 689. Thus, we find that the errant admission of Dr. Borzada's expert opinions was harmless error.

**D. Asking Appellant Whether it Was Lawful for Him to Possess a Firearm Was Not Reversible Error**

Appellant next asserts that the Commonwealth's line of questioning regarding the firearm used in the assaults was improper. Specifically, Appellant asserts that it was reversible error for the Commonwealth to ask Appellant if it was legal for him to possess a firearm and to question Appellant about what happened to the gun after the assaults. Appellant concedes that the issue is unpreserved and requests palpable error review. RCr 10.26; KRE 103.

### 1. Felon in Possession of a Firearm

■ During cross-examination of Appellant, the Commonwealth asked him whether he could legally possess a firearm. The implication was that Appellant was a convicted felon and thus, not able to possess a firearm. Appellant answered that he could not legally possess a firearm. Appellant had not been charged with being a convicted felon in possession of a firearm; therefore, Appellant asserts that this question introduced inadmissible evidence of other crimes in violation of KRE 404(b) and KRE 404(c). Appellant also challenges the relevancy and probative value, under KRE 401 and KRE 403, of delineating his possession of the gun as unlawful.

Evidence of Appellant's unlawful possession of a firearm was relevant as a rebuttal to Appellant's claim that he was a law-abiding citizen. On direct, Appellant admitted to a previous felony conviction for drug trafficking but then attempted to anticipatorily rehabilitate himself by commenting at length on his changed nature, portraying himself as a family man. The fact that he continued to violate the law by possessing a firearm was highly relevant as a rebuttal of the picture Appellant painted on direct.

Furthermore, during direct examination by his own counsel, Appellant admitted to a previous felony conviction and to possessing a firearm and using it in the alleged assaults. Thus, the other crime that Appellant claims should not have been admitted, being a felon in possession of a handgun, was already revealed by the defense on direct. In this sense, the Commonwealth did not offer evidence of other crimes in violation of KRE 404(b). Rather, the Commonwealth put a label to the component parts of the other crime already introduced by Appellant. However improper the Commonwealth's question may have been, we cannot find palpable error. Before the Commonwealth even began cross-examination, the jury was aware that Appellant was a felon in possession of a firearm and was free to draw whatever conclusions they wanted from those facts. We do not find that the Commonwealth's added step of drawing attention to the illegality of Appellant's firearm possession created a substantial possibility the result in the case would have been different absent the question. *Brewer*, 206 S.W.3d at 349.

Furthermore, we cannot find that the Commonwealth violated KRE 404(c). The rule reads, in pertinent part:

> In a criminal case, if the prosecution intends to introduce evidence pursuant to subdivision (b) of this rule as part of its *case in chief*, it shall give reasonable pretrial notice to the defendant of its intention to offer such evidence.

(Emphasis added.)

To begin with, as explained above, the Commonwealth can hardly be said to have introduced the evidence of other crimes as it was already presented by Appellant. Furthermore, the notice requirement of KRE 404(c) applies to other crimes evidence intended to be introduced during the prosecution's case in chief. The evidence was not introduced during the Commonwealth's case in chief and nothing in the rule indicates that it applies to testimony elicited on cross-examination.

### 2. Complicity to Tamper with Physical Evidence

■ During cross-examination, the Commonwealth questioned Appellant about what happened to the gun after the assaults. Appellant disclosed that his roommate disposed of the weapon. Appellant now asserts that this line of questioning was improper because it lacked relevance and it improperly introduced evidence of other crimes, namely complicity

to tamper with physical evidence. We disagree.

Attempting to dispose of a firearm that was just used in an assault is at least circumstantial proof of consciousness of guilt. Although KRE 404(b) generally prohibits proof of other crimes, this Court has held that evidence that demonstrates a consciousness of guilt is an unenumerated exception to KRE 404(b)'s rule of inadmissibility. *See, e.g., Rodriguez v. Commonwealth,* 107 S.W.3d 215, 219–220 (Ky.2003). Additionally, we find no violation of 404(c) because the evidence was not introduced during the Commonwealth's case in chief. Therefore, we hold that there was nothing improper in the trial court's admission of Appellant's testimony in this instance.

**E. The Commonwealth's Proof Did Not Support a Conviction for First–Degree Assault of Henderson**

Finally, Appellant argues that the trial court erred in denying his motion for directed verdict because there was insufficient proof of a "serious physical injury" to convict him for first-degree assault of Henderson. Appellant further asserts that the Commonwealth's failure to prove the "serious physical injury" element of the charged offense violated his right to due process.[5] The standard of review for a motion for directed verdict is set forth in *Commonwealth v. Benham:*

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial

> court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given such testimony.

816 S.W.2d 186, 187 (Ky.1991).

In a criminal case, the Constitution of the United States requires the government to prove each element of the charged offense beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Miller v. Commonwealth,* 77 S.W.3d 566, 576 (Ky.2002). Failure to prove an element beyond a reasonable doubt violates an accused's right to due process. *In re Winship,* 397 U.S. at 364, 90 S.Ct. 1068.

In order to sustain a conviction for first-degree assault under KRS 508.010, the Commonwealth must prove that Appellant caused a "serious physical injury." KRS 500.080(15) defines "serious physical injury" as a "physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily organ." Ultimately, a finding of first-degree assault is dependent on the seriousness of the resulting injury, not the potential of the act to result in "serious physical injury." *Anderson v. Commonwealth,* 352 S.W.3d 577, 581 (Ky.2011).

The Commonwealth did not call any medical experts to testify to Henderson's injuries. The only evidence presented at trial of Henderson's injury was her own testimony. She testified to suffering a through-and-through gunshot wound to her right hand. She stated that the pain of being shot was "worse than childbirth."

---

5. This issue was properly preserved for appellate review by Appellant's motion for directed

verdict as to this charge.

At the hospital, her wound was sutured and she was sent home the same night. One week after the shooting, she told Warner, "[t]he pain comes every now and then, but the actual pain that I was in it went away two days later." Notes from the emergency room indicated that she did not experience a limited range of motion or loss of strength. Henderson claimed that she had to work "a couple months" with a stress ball to regain strength in her hand but admitted that the only follow up treatment she had was to have her stitches removed. A small scar remains on Henderson's right wrist where the bullet penetrated. At trial, the Commonwealth focused on the "serious and prolonged disfigurement" and "prolonged impairment of health" prongs of "serious physical injury."[6]

### 1. Serious and Prolonged Disfigurement

■ Although the Commonwealth focused on the "serious and prolonged disfigurement" prong at trial, it has all but abandoned this argument in its brief. While on the stand, Henderson held up her right wrist to show the jury a small scar, which is barely visible on trial video. In *Anderson*, we held that a scar along the victim's jawline resulting from a laceration

was a disfigurement, but that it was not of "sufficient severity" to constitute "serious physical injury" because. KRS 500.080(15) "requires not merely disfigurement but 'serious and prolonged disfigurement.'" *Anderson*, 352 S.W.3d at 582. Similarly, we held that small stab wound scars on a victim's legs were a disfigurement but not a "serious and prolonged" disfigurement in *Mullins v. Commonwealth*, No. 2011–SC–000634, 2012 WL 6649199, at *2 n. 4 (Ky. 2012).

The reasoning of *Mullins* and *Anderson* applies in the present case. Although the scar on Henderson's hand is a disfigurement, it is not a "serious and prolonged" one. We have previously found that small scars on a victim's jaw or legs were not severe enough to establish "serious" disfigurement. Therefore, it logically follows that a similarly diminutive scar on a person's wrist will not be of sufficient severity to constitute a "serious" disfigurement.

### 2. Prolonged Impairment of Health

■ Having found no "serious and prolonged disfigurement," we now turn to Appellant's argument that Henderson suffered a "prolonged impairment of health." The Commonwealth's brief goes into detail about the pain Henderson suffered at the time of her injury and her claim that it

---

6. The Commonwealth's brief makes a cursory reference to the "prolonged loss or impairment of the function of any bodily organ" prong but does not support its assertion that Henderson's injury fits within this prong with any case law. A finding of "serious physical injury" by "prolonged impairment of the function of a bodily organ" is rare in Kentucky. In *Jones v. Commonwealth*, 737 S.W.2d 466, 468 (Ky.App.1987), the Court of Appeals found that the permanent loss of an eye was both a "serious and prolonged disfigurement" and a "prolonged loss or impairment of the function of a bodily organ." The Commonwealth has not offered any justification for a finding of prolonged impairment of the function of Henderson's hand.

Furthermore, the Commonwealth has not asserted that Henderson's injury constituted a "substantial risk of death." In prior cases, we have found "substantial risk of death" when a victim suffered multiple stab wounds to the face, neck, and upper extremities resulting in the loss of a large amount of blood and close hospital observation, *Brooks v. Commonwealth*, 114 S.W.3d 818 (Ky.2003), or when a victim suffered a skull fracture, hemorrhaging, and blood clots that required six days of treatment in an intensive care unit, *Commonwealth v. Hocker*, 865 S.W.2d 323 (Ky.1993). Nothing in the record shows Henderson's injuries rose to an equivalent level of severity.

was "worse than childbirth." Nonetheless, however severe the pain might have been in the immediate aftermath of her wounding, we cannot say that such short-term pain indicates any "prolonged impairment of health." At trial, Henderson admitted that one week after the accident she told Warner that her pain subsided in two days.

To demonstrate the prolonged effects of Henderson's injury, the Commonwealth points us to her testimony that she had to do therapy with a stress ball and that it took her "a couple of months" to get her hand back to full strength. The Commonwealth finds further proof of prolonged impairment in Henderson's testimony that, during this time, she had difficulty with menial tasks such as driving, brushing her hair, and performing toilet hygiene.

The Commonwealth also points us to two cases that it claims establish Henderson's injury as a "prolonged impairment of health." The first, *Parson v. Commonwealth*, 144 S.W.3d 775 (Ky.2004), was this Court's first consideration of what constitutes "prolonged impairment of health" under KRS 500.080(15). In *Parson*, we found "prolonged impairment of health" where the victim suffered from headaches, neck pain, limited range of motion due to muscle spasms, upper back pain, and numbness in her arm five months after an assault. *Id.* at 786. Additionally, the victim in *Parson* presented evidence that she underwent prolonged physical therapy. *Id.* Furthermore, we held that it was reasonable to believe the victim was still suffering some effects of her injury nineteen months after the assault. *Id.* at 787.

The second case, *Clift v. Commonwealth*, 105 S.W.3d 467 (Ky.App.2003), involved an eleven-month-old child who lost use of his arm for four weeks due to a broken humerus. The Court of Appeals held that a reasonable jury could find that the child suffered a "prolonged impairment of health." The Commonwealth asserts that the injuries suffered by the victims in *Parson* and *Clift* were only as severe as or less severe than the injuries suffered by Henderson, thus justifying Appellant's conviction for first-degree assault. We disagree.

Although medical proof is not necessary to establish a "serious physical injury," *Brooks*, 114 S.W.3d at 824, it is certainly helpful in establishing the seriousness of an injury, *Anderson*, 352 S.W.3d at 581. Unlike the multiple incidents of prolonged pain, limited range of motion, and arm numbness, which required long-term medication and physical therapy in *Parson*, the only proof Henderson offered was her testimony that it took "a couple of months" to get her hand back to full strength. She also mentioned using a therapy ball, but did not describe her exercises with any particularity, nor did she mention seeing a physical therapist. The present case is not comparable to *Parson* because the victim in that case offered a more exacting level of proof than was presented in this case.

*Clift* is also inapplicable as it involved a fracture in a child of young age. We dealt with a similar injury to a child in *Schrimsher v. Commonwealth*, 190 S.W.3d 318 (Ky.2006). The child in *Schrimsher* suffered two fractures in one leg. *Id.* at 329. Although a doctor testified that the fractures would take just two months to heal, we held that "a reasonable jury could conclude two months of healing time is 'prolonged' with respect to the young life of a six-month-old infant." *Id.* A fracture is more severe than the wound suffered by Henderson and although Henderson testified it took her "a couple months" to regain full strength in her arm, considering the severity of injury in tandem with the

age of the victim, we cannot find that Henderson's injury was prolonged similarly to the infants' in *Clift* and *Schrimsher*.

Ultimately, we conclude that the injury suffered by Henderson is more akin to the assault victim in *Anderson*. The victim in *Anderson* suffered a one-inch deep laceration along the jaw line. *Anderson*, 352 S.W.3d at 582. He was taken to the hospital, given an IV treatment, his laceration was sutured, and he was sent home. *Id.* The victim presented no medical evidence but claimed he was. off work "a while" and that he had sharp pains in his neck "every once in a while." *Id.* We found that a "more exacting level of proof" was required than what the Commonwealth presented and held that the Commonwealth failed to prove "prolonged impairment of health." *Id.*

Similarly, we find that Appellant's claim that she was off work "a couple months" and that she had to use a stress ball is insufficient proof to sustain a finding of "serious physical injury," a necessary element of first-degree assault. Drawing all fair and reasonable references from the evidence in favor of the Commonwealth, but reserving to the jury questions as to the credibility of Henderson as a witness, insufficient evidence was presented to convict Appellant of first-degree assault in this instance. *Benham*, 816 S.W.2d at 187. The only evidence presented at trial of Henderson's injury was her own testimony. Even if we were to assume her testimony was entirely true, as explained above, that testimony does not establish "serious physical injury." To convict Appellant when there is a failure of proof of

an element of the crime charged is a violation of due process. *In re Winship*, 397 U.S. at 364, 90 S.Ct. 1068. Accordingly, we reverse Appellant's conviction for first-degree assault of Henderson.

## III. CONCLUSION

We affirm Appellant's conviction for first-degree assault of Washington. However, we reverse Appellant's conviction for first-degree assault of Henderson. Additionally, we remand for further proceedings in accordance with this Opinion.[7]

MINTON, C.J., CUNNINGHAM, and VENTERS, JJ., concur. KELLER, J., concurs in part and dissents in part by separate opinion in which ABRAMSON and NOBLE, JJ., join.

KELLER, J., Concurring in part and dissenting in part.

I respectfully concur in result only as to the Majority's conclusion that the trial court allowed Dr. Borzada to testify to matters as an expert witness. As noted by the Majority, the Commonwealth asked Dr. Borzada what would have happened to Washington had he not performed surgery. McDaniel objected and the Commonwealth rephrased the question, this time asking Dr. Borzada if he would unnecessarily perform surgery. I do not believe that asking Dr. Borzada whether he would perform unnecessary surgery called for an opinion, expert or otherwise. The question simply addressed what Dr. Borzada's general method of practice was. While the question and answer may have been irrelevant, they did not violate the

---

**7.** Generally, retrial after an Appellate Court reverses a conviction does not result in double jeopardy. *Couch v. Maricle*, 998 S.W.2d 469, 471 (Ky.1999). Although the conviction of a defendant on a lesser-included offense constitutes an acquittal of all higher degrees of the offense, *id.*, nothing precludes retrial on

lesser-included offenses upon reversal of a conviction for a greater offense, *McGinnis v. Wine*, 959 S.W.2d 437, 439 (Ky.1998). In the present case, the record reveals that the jury instructions included several lesser-included offenses. Thus, retrial on those offenses is appropriate in this instance.

general prohibition regarding witness opinions.

However, it is a close call as to whether Dr. Borzada's testimony regarding Washington's pain constituted expert testimony. At trial, Dr. Borzada testified to the following regarding Washington's pain:

> Commonwealth: A person who has the sort of operation you've performed on Mr. Washington, umm, is it painful or pain free?
>
> Dr. Borzada: It's painful.
>
> Commonwealth: And how long does that pain last?
>
> Dr. Borzada: Umm, it will be fairly intense for four....
>
> Defense Counsel: Objection.
>
> Trial Judge: Overruled.
>
> Dr. Borzada: Four or Five days and will ache for a couple of weeks before it settles down in the average person.
>
> Commonwealth: As it relates to Mr. Washington, and you may or may not have been the doctor, would he have been prescribed narcotics to deal with that pain?
>
> Dr. Borzada: Yes, sir.

KRE 701 provides that a non-expert may offer an opinion that is: "(a) [r]ationally based on the perception of the witness; (b) [h]elpful to a clear understanding of the witness' testimony or the determination of a fact in issue; and (c) [n]ot based on scientific, technical, or other specialized knowledge...." Dr. Borzada's testimony that Washington would have pain following surgery was not, given the extent of Washington's injuries and Dr. Borzada's surgery, an opinion but a statement of fact. Furthermore, that fact is within a lay person's knowledge and does not require scientific, technical, or other specialized knowledge.

On the other hand, Dr. Borzada's testimony about how long Washington's pain would have lasted and whether Washington would have been prescribed narcotics does require specialized knowledge. Admitting that testimony, absent the prior disclosure required by RCr 7.24(1)(c), was error. However, in light of Washington's own testimony regarding his post-surgery pain and treatment, I agree with the Majority that the error was harmless.

I respectfully dissent as to the Majority's conclusion that there was insufficient proof of a "serious physical injury" to support a conviction for first-degree assault of Henderson.

As set forth in *Acosta v. Commonwealth*, 391 S.W.3d 809, 816 (Ky.2013):

> When presented with a motion for a directed verdict, a court must consider the evidence as a whole, presume the Commonwealth's proof is true, draw all reasonable inferences in favor of the Commonwealth, and leave questions of weight and credibility to the jury. *Commonwealth v. Benham*, 816 S.W.2d 186, 187–88 (Ky.1991). The trial court is authorized to grant a directed verdict if the Commonwealth has produced no more than a mere scintilla of evidence; if the evidence is more than a scintilla and it would be reasonable for the jury to return a verdict of guilty based on it, then the motion should be denied. *Id.* On appellate review, the standard is slightly more deferential; the trial court should be reversed only if "it would be *clearly unreasonable* for a jury to find guilt." *Id.* (emphasis added).

A directed-verdict motion is reviewed in light of the proof at trial and the statutory elements of the alleged offense. *Lawton v. Commonwealth*, 354 S.W.3d 565, 575 (Ky.2011). The directed-verdict question is not controlled by the law as described in the jury instructions, but by the statutes creating the offense. *Id.*

Thus, this Court is required to examine the evidence introduced at trial concerning whether McDaniel committed first-degree assault against Henderson and to compare that proof to the statutory elements of the offense. As correctly noted by the Majority, under KRS 508.010, the Commonwealth must prove that McDaniel caused a "serious physical injury" to Henderson. KRS 500.080(15) defines "[s]erious physical injury" as "physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily organ[.]" Physical injury "means substantial physical pain or any impairment of physical condition." KRS 500.080(13). Contrary to the Majority, I believe that there was sufficient evidence that Henderson suffered a prolonged impairment of health.

At trial, Henderson testified that McDaniel shot her in her right hand and that the bullet went through her hand. She went to the hospital that day, received stitches in her hand, and was able to go home that same night. Henderson testified that, at the time she was shot, it hurt worse than childbirth and that she was given medicine for the pain. Additionally, Henderson admitted that, one week after the shooting, she told Detective Warner that the pain came every now and then but the actual pain went away two days later.

Henderson further testified that it took a couple of months for her to restore the function of her hand and that she had to use a therapy ball to help get feeling back in her hand. Henderson noted that she was right-handed and that the injury to her right hand from being shot made her feel "handicapped." Henderson explained that she could not eat, drive, or fix her hair, and had difficulty completing toilet hygiene for a time after the injury.

Henderson also showed the jury the two scars on her hand where the bullet went through her hand.

When questioned on cross-examination regarding statements she made while in the emergency room, Henderson did not recall saying that she had no problems with range of motion and that she had no numbness, tingling, or radiating pain. Henderson agreed that the injury to her hand did not affect the strength of her arm and that she did not have any broken bones. Additionally, Henderson indicated that the only follow-up that was required was to have her stitches removed.

The Majority correctly notes that the only proof about Henderson's injury offered to the jury was Henderson's testimony. No medical proof was offered. As noted by this Court in *Anderson v. Commonwealth*, 352 S.W.3d 577, 581 (Ky.2011), the statutory definition of "serious physical injury"

[s]ets a fairly strict level of proof which must be met by sufficient evidence of injury. While medical proof is not necessary, ... it certainly can assist in establishing the seriousness of the injury. When determining whether a defendant caused a "serious physical injury," the issue is not whether there was proof of an act that *could* cause "serious physical injury." The issue is whether there was proof of an act that *did*, in fact, cause "serious physical injury."

(Internal citations and quotations omitted). In *Luttrell v. Commonwealth*, Ky., 554 S.W.2d 75 (1977), we held that a police officer who was shot in the chest with bird shot, was hospitalized for five days, ... was off work for approximately six weeks [and whose wounds were "superficial,"] had not, as a matter of law, sustained a serious physical injury. *Id.* at 77–79. And in *Souder v. Commonwealth*, Ky., 719 S.W.2d 730 (1986), we

held that a child who sustained bruising, a swollen arm, and burns in and about the mouth from a cigarette or cigarette lighter, none of which required follow-up treatment after an emergency room visit, had not sustained a serious physical injury. *Id.* at 732. However, in *Commonwealth v. Hocker,* Ky., 865 S.W.2d 323 (1993), we held that an assault victim who sustained facial contusions and lacerations requiring sutures, the loss of several teeth which were successfully reimplanted, and a nondisplaced linear fracture of the skull followed by symptoms of concussion but no neurologic injury, was properly found to have sustained a serious physical injury. *Id.* at 324–25. In *Meredith v. Commonwealth,* Ky.App., 628 S.W.2d 887 (1982), the Court of Appeals held that the language., "impairment of physical condition," in the definition of "physical injury" simply means "injury." *Id.* at 888. *Parson v. Commonwealth,* 144 S.W.3d 775, 786–87 (Ky.2004).

In *Parson,* this Court determined that substantial, prolonged pain constitutes a "prolonged impairment of health" and found "serious physical injury" under this prong where the victim suffered from headaches, neck pain, lack of range of motion caused by muscle spasms, upper back pain, and numbness in her right arm for five months after a car accident, and continued to have neck pain, for which she was required to take medication regularly, at the time of trial. *Id.*

I note that this is a close case, especially in light of this Court's decision in *Luttrell v. Commonwealth,* 554 S.W.2d 75 (Ky. 1977) as set forth above. However, in that case, the police officer's wounds were described as "superficial" and it is unclear from the facts in that case the seriousness of the injury. In this case, Henderson suffered a through-and-through gunshot wound to her right hand, it took two months to restore the functionality of her hand, and she was not able to use her hand for even activities of daily living. Thus, when considering the evidence in the light most favorable to the Commonwealth, I cannot say that it would be "clearly unreasonable" for a jury to conclude that the loss of functionality in Henderson's right hand for a couple of months constituted a "prolonged impairment of health." *See Acosta,* 391 S.W.3d at 816.

Furthermore, I find it compelling that the jury found that Henderson's injury was a serious physical injury despite being instructed on second-degree assault and fourth-degree assault, which only require a finding of a physical injury. Specifically, the jury was instructed on second-degree assault under the theory that McDaniel "intentionally cause[d] *physical injury* to [Henderson] by means of a deadly weapon or dangerous instrument." KRS 508.020(1)(b) (emphasis added). The jury was also instructed on fourth-degree assault under the theory that McDaniel, "with recklessness ... cause[d] *physical injury* to [Henderson] by means of a deadly weapon or a dangerous instrument. KRS 508.030(1)(b) (emphasis added). Thus, based on the preceding, I do not believe the trial court erred in denying McDaniel's motion for a directed verdict on the charge of first-degree assault of Henderson. I would, therefore, affirm McDaniel's conviction on that count.

I concur in the Majority opinion on all other issues.

ABRAMSON and NOBLE, JJ., join.