RENDERED: OCTOBER 28, 2021
TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-0295-DG

KENTUCKY GUARDIANSHIP
ADMINISTRATORS, LLC, AS
CONSERVATOR FOR KALI CRUSENBERRY;
AND LOUISE YOUNT, AS GUARDIAN FOR
KALI CRUSENBERRY

APPELLANTS

ON REVIEW FROM COURT OF APPEALS
V.     NOS. 2017-CA-0665, 2017-CA-0727 & 2017-CA-0752
WHITLEY CIRCUIT COURT NO. 14-CI-00590

BAPTIST HEALTHCARE SYSTEM, INC.
D/B/A BAPTIST HEALTH CORBIN;
APOGEE MEDICAL GROUP, KENTUCKY,
PSC; AND SUBHOSE BATHINA, M.D.

APPELLEES

## OPINION OF THE COURT BY JUSTICE KELLER

### AFFIRMING

Kentucky Guardianship Administrators, LLC, conservator for Kali Crusenberry, and Louise Yount, guardian for Kali Crusenberry (collectively "Crusenberry") appeal from the Court of Appeals' decision affirming the Whitley Circuit Court's judgment in favor of Baptist Healthcare System, Inc. (Baptist Health) and Apogee Medical Group, Kentucky, PSC and Subhose Bathina, M.D. (Bathina). After a thorough review, we affirm.

# I. BACKGROUND

Kali Crusenberry was admitted to Baptist Health in Corbin on August 1, 2013, for symptoms including fever, vomiting, and extreme nausea. Upon arrival, Crusenberry was diagnosed with a urinary tract infection, a kidney infection, gallstones, pneumonia, and hypokalemia (low potassium). She was treated surgically for a kidney stone, which included placement of a stent. Additional treatment included, among other things, the administration of an antibiotic (Azithromycin) as well as potassium replacement. Crusenberry's condition dramatically improved. By August 4, after three days of fluctuating potassium levels, nurses stopped following the standing potassium replacement order that had been put in place. On August 5, Crusenberry was discharged by Dr. Bathina who, after a review of her record, sent her home with a prescription for a different antibiotic, Levaquin. When taken by patients with low potassium levels, both Azithromycin and Levaquin increase a patient's risk for prolonged QT intervals resulting in arrhythmias and possible cardiac arrest. Both antibiotics come with a warning required by the FDA to that effect.

The next morning, while at her home, Crusenberry took the Levaquin as prescribed. At around 11:00 a.m., her mother found her in cardiac arrest. Her mother called 911. Paramedics soon arrived and took Crusenberry back to Baptist Health. Before arriving, the paramedics shocked Crusenberry's heart. Upon arrival, an EKG revealed that her QT interval was dangerously prolonged, and testing showed that her potassium levels were, again, critically low. A prolonged QT interval can be fatal and can lead to dangerous arrhythmias

2

(irregular heartbeats). Following her cardiac arrest, further tests indicated that Crusenberry had suffered an onset of Takotsubo Syndrome. Takotsubo Syndrome is a weakening of the left ventricle of the heart resulting from a sudden emotional or physical trigger.[1]

Because of the cardiac arrest, Crusenberry's brain was deprived of oxygen. As a result, Crusenberry can no longer speak, control her bowels, or in any way ambulate with her upper or lower extremities. Crusenberry brought suit against both Baptist Health and Dr. Bathina for her injuries. Crusenberry claimed that both the hospital's nursing staff and Dr. Bathina breached their respective standards of care by forgoing the standing potassium replacement order and by prescribing her two antibiotics known to be linked to arrhythmias and cardiac arrest when taken by patients with low potassium. Crusenberry further argues that the breach of these duties directly caused her injuries.

After eleven days of trial, the jury found that neither Dr. Bathina nor Baptist Health had breached their standard of care. Because it found in favor of the defendants on that issue, the jury did not reach the issues of causation or damages. The Court of Appeals affirmed the trial court's ruling. Finding no reversible error, we affirm the Court of Appeals.

---

[1] *Takotsubo cardiomyopathy (broken-heart syndrome)*, HARVARD HEALTH PUBL'G, (Jan. 29, 2020) https://www.health.harvard.edu/heart-health/takotsubo-cardiomyopathy-broken-heart-syndrome (last visited Oct. 7, 2021).

## II. STANDARD OF REVIEW

When reviewing a trial court's evidentiary rulings, our review is limited to a determination of whether the trial court abused its discretion. *Goodyear Tire & Rubber Co. v. Thompson,* 11 S.W.3d 575, 577 (Ky. 2000) (citations omitted). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999). "Rulings upon admissibility of evidence are within the discretion of the trial judge," and we will not reverse absent a "clear abuse of discretion." *Simpson v. Commonwealth,* 889 S.W.2d 781, 783 (Ky. 1994). Because they are evidentiary issues, the first seven of the eight issues before us in the instant case therefore squarely fit into an abuse of discretion standard.

The standard of review for the eighth issue on appeal, regarding the jury instruction, is discussed *infra.* On that issue, we rely upon this Court's prior holding that "a trial court's decision on whether to instruct on a specific claim will be reviewed for abuse of discretion; the substantive content of the jury instructions will be reviewed *de novo.*" *Sargent v. Shaffer,* 467 S.W.3d 198, 204 (Ky. 2015), *overruled on other grounds by Univ. Med. Ctr., Inc. v. Shwab,* 628 S.W.3d 112 (Ky. 2021).

## III. ANALYSIS

On appeal to our Court, Crusenberry claims eight errors:

1. The trial court improperly precluded Baptist Health's Incident Report as a subsequent remedial measure;

4

2. The trial court improperly precluded Crusenberry's causation expert from offering his reliable causation opinions;
3. The trial court improperly precluded Crusenberry from cross-examining Dr. Bathina with the Baptist Health Audit Trail;
4. The trial court improperly precluded Crusenberry from cross-examining Baptist Health's corporate representative on matters of credibility;
5. The trial court improperly precluded Crusenberry from cross-examining one of Dr. Bathina's expert witnesses with a medical journal article found in his case file;
6. The trial court improperly allowed Dr. Bathina to give undisclosed expert testimony;
7. The trial court improperly allowed expert witnesses for Baptist Health and Dr. Bathina to give undisclosed expert testimony; and
8. The trial court's jury instruction improperly limited, and prejudicially misstated, Baptist Health's legal duty.

We consider each issue in turn.

## A. Evidence Crusenberry argues was improperly excluded

### 1. Baptist Health's Incident Report

Crusenberry first argues that the trial court improperly excluded an Incident Report produced by Baptist Health Lexington regarding Crusenberry's treatment at Baptist Health Corbin. The Incident Report appears to be a screen shot from Baptist Health's computer system. The final sentence of the "Incident Description" portion of the report states, "Clinically suspected that combination of levofloxacin[2] and hypokalemia led to ventricular arrythmia."

Pretrial, both Baptist Health and Dr. Bathina moved the court in limine to exclude the Incident Report. At a pretrial motion hearing, Baptist Health and Dr. Bathina argued that the Incident Report was a subsequent remedial measure inadmissible under Kentucky Rule of Evidence (KRE) 407. They also

---

[2] Levofloxacin is the generic name of Levaquin.

5

argued that Crusenberry could not properly authenticate the report or lay a proper foundation for the report because no one knew who conducted the investigation that led to the creation of the Incident Report or who wrote the Incident Report.[3] Crusenberry, on the other hand, argued that the Incident Report was extremely relevant on the issue of causation and that it supports her expert while rebutting the testimony of the defendants' experts. Finally, Crusenberry argued to the trial court that the Incident Report was admissible under KRE 702[4] as her expert relied upon it in reaching his conclusions. The trial court agreed with Baptist Health and Dr. Bathina and excluded the Incident Report, noting specifically that Crusenberry did not know who wrote the report.

Despite the trial court's pretrial ruling, Crusenberry asked the court to allow her to cross-examine Dr. George Stacy about the Incident Report. Dr. Stacy is a cardiologist who testified at trial as an expert witness on behalf of Dr. Bathina. He testified that Crusenberry's condition was caused by Takotsubo Syndrome and had nothing to do with low potassium or Levaquin. He further testified that he saw no reports written by doctors that attributed her condition to anything other than Takotsubo and that the only reports he saw that did so were written by nurse practitioners. After this testimony, Crusenberry's counsel approached the bench and moved the trial court to

---

[3] Crusenberry claims that Baptist Health and Dr. Bathina did not present their authentication argument to the trial court, but our review of the record shows this to be inaccurate.

[4] We assume on review that Crusenberry meant KRE 703.

allow him to use the Incident Report. Specifically, he sought to ask Dr. Stacy if the report's conclusion that the "combination of levofloxacin and hypokalemia led to ventricular arrythmia" was incorrect. Bathina objected, arguing that Dr. Stacy had never seen the Incident Report and would not know anything about it. The trial court denied Crusenberry's motion.

To this Court, Crusenberry argues that the Incident Report is not a subsequent remedial measure under KRE 407 and this Court's recent decision in *Thomas v. University Medical Center, Inc.*, 620 S.W.3d 576 (Ky. 2020). Crusenberry alleges that the high probativeness of the report was not substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury under KRE 403. She further argues that the report was proper fodder for cross-examination under KRE 611, which allows a witness to "be cross-examined on any matter relevant to any issue in the case, including credibility" and *Miller ex rel. Monticello Banking Co. v. Marymount Medical Center*, 125 S.W.3d 274, 281 (Ky. 2004), which allows for an "unlimited" "range of possibilities" to prove the bias of a witness.

On the other hand, Baptist Health argues to this Court that the Incident Report was properly excluded for three reasons. First, Baptist Health argues that Crusenberry failed to properly authenticate the Incident Report as required by KRE 901. Second, although conceding that the Incident Report is not a subsequent remedial measure requiring exclusion under KRE 407 and *Thomas*, Baptist Health argues that the report lacked probative value and its admission would have been unduly prejudicial under KRE 403. Third, Baptist

7

Health argues the trial court properly prohibited Crusenberry from cross-examining Dr. Stacy regarding the Incident Report because it was not probative of Dr. Stacy's credibility. Finally, Baptist Health argues that even if the report was improperly excluded, such exclusion was harmless error.

Dr. Bathina, like Baptist Health, argues that the Incident Report was properly excluded because it was not properly authenticated and because, under KRE 403, its probative value was substantially outweighed by the risk of undue prejudice and confusion of the jury. Dr. Bathina also argues that any error in the admission of the Incident Report was harmless.

Although neither Baptist Health nor Dr. Bathina, in their arguments to this Court, seem to rely on KRE 407 as a basis for exclusion of the Incident Report, because the trial court did not yet have the benefit of our decision in *Thomas* when it made its ruling on the exclusion of the report, we will very briefly address this issue. The relevant part of KRE 407 states:

> When, after an event, measures are taken which, if taken previously, would have made an injury or harm allegedly caused by the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction.

In *Thomas*, we sought to clarify this rule by holding that a determination of whether a post-incident investigatory report qualifies under KRE 407 as a subsequent remedial measure "turns on whether the report recommends a remedial change and whether that change is implemented." 620 S.W.3d at 586. In this case, it is clear that the

8

Incident Report did not recommend any "remedial change" as required by *Thomas*, and therefore should not have been excluded on this basis.

Another basis for exclusion argued by Baptist Health and Dr. Bathina to the trial court was a lack of authentication. Crusenberry argues that Baptist Health and Dr. Bathina did not make this argument to the trial court and that it is therefore not preserved for our review, but this is a mischaracterization of the arguments of Baptist Health and Dr. Bathina at the pretrial motion hearing. At the hearing, Dr. Bathina's counsel repeatedly questioned who wrote the report and pointed out that it was not signed. Baptist Health's attorney, although primarily relying on the KRE 407 argument, stated that she "agree[d] with [the] authentication and laying a foundation" arguments made by Dr. Bathina. Further, as stated above, the trial court specifically noted while making its ruling that Crusenberry did not know who authored the Incident Report. Crusenberry offered no argument or in any other way indicated that she did have this knowledge and could authenticate the document.

KRE 901(a) requires that a document or other matter be authenticated or identified prior to its admission. This requirement "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." KRE 901(a). Although not the only way to authenticate an item, one way this can be accomplished is through the "[t]estimony of [a] witness with knowledge." KRE 901(b)(1). That witness need only testify that the "matter is what it is claimed to

9

be." *Id.* "The burden on the proponent of authentication is slight; only a prima facie showing of authenticity is required." *Sanders v. Commonwealth*, 301 S.W.3d 497, 501 (Ky. 2010).

In this case, Crusenberry sought to admit the Incident Report, and therefore was required to provide at least some evidence regarding what exactly that Incident Report was, i.e., by whom it was generated; in what context it was generated; how it was generated; etc. Crusenberry offered absolutely no evidence of this. Further, the foundational requirement of authentication is not eradicated merely because the evidence is used on cross-examination or to impeach a witness. Yet, even after being advised of the authentication problem at the pretrial hearing, Crusenberry made no attempt to authenticate the Incident Report before attempting to question Dr. Stacy about it.[5] Accordingly, the trial court did not err in excluding the Incident Report.

Because we hold that the trial court did not err in excluding the Incident Report based on a lack of authentication, we need not address the parties' KRE 403 arguments. However, we note that, with a proper foundation, a hospital's conclusion regarding the cause of an incident is likely to be highly relevant in a medical malpractice case.

---

[5] It is unclear from our review of the record why Crusenberry did not have sufficient information to properly authenticate the Incident Report. However, we note that she had to make several requests and motions to the trial court before certain internal investigation documents were even turned over in discovery. While we understand that the parties did not have the benefit of our *Thomas* decision while this case was being litigated, it should now be clear that documents such as this Incident Report are discoverable, even if not necessarily admissible.

10

### 2. Causation Expert

Crusenberry further argues that the trial court improperly limited the testimony of its primary causation witness, Dr. Tisdale. Dr. Tisdale is a Doctor of Pharmacy. He is a professor of pharmacy at both Purdue University and Indiana University. He has published extensively on the topic of pharmaceutical risks associated with heart arrhythmias such as *Torsades de Pointes*, from which Crusenberry may have suffered. In addition to his scholarly work, Dr. Tisdale has served for over a decade as a clinical pharmacist in hospitals, assisting and advising ICU and cardiology medical care teams as they treat patients. Crusenberry's Kentucky Rule of Criminal Procedure (CR) 26 expert disclosure on Dr. Tisdale stated that he would testify to

- The pharmacologic treatment of hypokalemia and the risks associated with failing to treat hypokalemia appropriately;
- The background, uses, contraindications, warnings and incident reports for Levaquin;
- *Torsade de Pointes,* including the nature, causes, treatment, and outcomes of the condition;
- That Kali Crusenberry suffered from hypokalemia, which was not treated appropriately;
- That Levaquin was contraindicated and should not have been prescribed to Kali;
- There were a number of other antibiotics that could have been prescribed, which would have had the same benefit and less risks; and
- Kali's uncorrected hypokalemia and Levaquin combined to cause prolonged QT and cardiac arrest.

Crusenberry referred to Dr. Tisdale as her causation expert at the pretrial motion hearing and at different points during the trial. However, on

11

appeal, she now argues that his testimony was also relevant to the issue of standard of care and that limiting his testimony was an abuse of discretion.

Before trial, both Baptist Health and Dr. Bathina moved to exclude Dr. Tisdale's testimony in its entirety. First, they argued that Dr. Tisdale should be excluded from testifying on the premise that he did not qualify as an expert for the purposes of giving a medical opinion. That motion was denied at the conclusion of a pretrial hearing. Dr. Bathina also filed a *Daubert* motion seeking to prohibit Dr. Tisdale from testifying to standard of care, cardiology, measurement of QT intervals, causation, and treatment of patients with hypokalemia. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). The trial court similarly denied this motion at the conclusion of the same hearing.

At trial, Dr. Tisdale testified regarding each of the areas permitted by the trial court's orders regarding his testimony. After much of this testimony was completed, an extended exchange occurred between Crusenberry's counsel and Dr. Tisdale about how Crusenberry had multiple risk factors that would have made it extremely likely that her cardiac arrest was caused by Levaquin. Crusenberry's counsel then asked Dr. Tisdale if the cause of Crusenberry's cardiac arrest was possibly a blood clot instead. Dr. Tisdale replied that it was not.

Dr. Bathina's counsel objected to Dr. Tisdale's opinion that Crusenberry's cardiac arrest was not caused by a blood clot. Following the objection, the trial court limited Dr. Tisdale's testimony by 1) striking his opinion that Crusenberry did not suffer a cardiac arrest resulting from a blood

clot from the record, and 2) issuing a limiting instruction that Dr. Tisdale no longer testify specifically to Crusenberry's treatment. Instead, Crusenberry could only elicit testimony regarding general questions about risk factors and causation within Dr. Tisdale's area of expertise. By that point, however, Dr. Tisdale had already discussed Crusenberry's specific risk factors, opined that her risk for suffering from *Torsades de Pointes* was 900% higher than the average person as a result of her risk factors and care, and even testified to his own calculation of Crusenberry's QT intervals over the course of several tests done while she was at the hospital. None of this testimony was stricken from the record.

Dr. Bathina and Baptist Health argue that Dr. Tisdale should not have been permitted to testify regarding Crusenberry specifically because Dr. Tisdale was not a "medical doctor," and therefore did not have the expertise required under KRE 702. Under Rule 702,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if:
>
> 1. The testimony is based upon sufficient facts or data;
> 2. The testimony is the product of reliable principles and methods; and
> 3. The witness has applied the principles and methods reliably to the facts of the case.

This rule was amended in 2000 to codify the United States Supreme Court's holding in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579. In *Daubert*, the United States Supreme Court held that rigid evidentiary requirements for

13

expert or scientific testimony were "at odds with the 'liberal thrust'" of evidentiary rules overall as they pertain to opinion testimony. *Id.* at 588 (citations omitted). Instead, the Court loosened the test applied to specialized expert testimony, requiring the three elements now incorporated into KRE 702. *See id.* at 589–90; KRE 702(1)–(3). By incorporating *Daubert* into its Rules of Evidence, Kentucky has likewise recognized the utility in loosening the rigid lines formerly applied to specialized expert testimony.

This Court interpreted KRE 702 as it pertains to medical professionals in *Savage v. Three Rivers Medical Center*, 390 S.W.3d 104 (Ky. 2012). In *Savage*, this Court held that a nurse practitioner was sufficiently qualified to testify regarding her interpretation of an x-ray. *Id.* at 117. Before *Savage*, this Court had held that ordinarily, nurses were not qualified to interpret the application of x-rays to the human body. *Id.* at 116–17. However, given her training and experience reading x-rays in the Vietnam war, this Court held that the nurse in *Savage* based her testimony on sufficient data. *Id.* Her testimony was therefore the product of reliable methods reliably applied. *Id.* In holding so, this Court established that expert medical testimony need not come from an M.D., so long as the elements of KRE 702 are met by sufficient relevant experience.

Here, Dr. Tisdale's testimony revealed that he had over a decade of experience working in hospitals with patients. In that experience, he recommended care to doctors on the same issues presented in Crusenberry's case. His testimony also revealed his academic expertise, the methods he used for calculating QT intervals, and the methods used in his studies to determine

14

the severity of risk factors in certain populations. Like the nurse in *Savage*, Dr. Tisdale's experience qualified him to give expert testimony under KRE 702 regarding causation and standard of care in Crusenberry's case. Furthermore, the trial court had already determined on two separate motions before trial that Dr. Tisdale could testify consistent with his expert disclosure.

The trial court therefore erred by basing its limitation of Dr. Tisdale's testimony on his lack of an M.D., apparently directly contravening its earlier rulings. In doing so, the trial court ignored the elements of KRE 702 and our subsequent decision in *Savage*. Not having an M.D. does not unilaterally disqualify an expert from testifying where he or she meets the elements of KRE 702. The trial court's ruling based solely on this fact was an abuse of discretion.

Finding error, we must determine if the error was harmless. An error is harmless "if we can say with fair assurance that the judgment was not substantially swayed by the error." *Brown v. Commonwealth*, 313 S.W.3d 577, 595 (Ky. 2010). Crusenberry sought to use Dr. Tisdale's testimony for causation. However, she argues that his testimony was also relevant to the issue of standard of care and that limiting his testimony was therefore not harmless. Dr. Bathina and Baptist Health argue that because Dr. Tisdale's purpose was to testify to causation, his testimony was irrelevant to standard of care and duty, the only issue decided by the jury, and therefore, the exclusion of his testimony was harmless. However, Crusenberry's CR 26 Expert Disclosures stated that Dr. Tisdale would testify not only to hypokalemia,

15

pharmaceutical risks, and *Toursades de Pointes*, but also that Crusenberry was "not treated appropriately" and that Levaquin "should not have been prescribed to [Crusenberry]." We may assume that Dr. Tisdale's testimony regarding Crusenberry specifically therefore would be relevant to the standard of care as well as causation.

The jury had already heard much of Dr. Tisdale's testimony that was probative of a standard of care as it related to Crusenberry's case before the limiting instruction was granted. As noted, the jury heard Dr. Tisdale's extensive testimony regarding Crusenberry's risk factors, how risk factors compounded, and what doctors should or should not prescribe for patients who suffer from low potassium, as well as how he would have advised a doctor to treat Crusenberry. Dr. Tisdale even testified regarding what he considered the ethical limitations for treating patients with QT lengthening drugs that have irregular potassium levels, giving a specific numerical limit for both potassium levels and QT lengths, immediately before discussing Crusenberry's own QT length (which he identified as high). By the time the limitation was placed on Dr. Tisdale's testimony, he had already likely done much of what he was called to testify to do. Striking one question and answer and limiting the remainder of Dr. Tisdale's testimony to general risk factors and care was therefore harmless error.

### 3. *Baptist Health Corbin's Audit Trail*

Crusenberry next argues that the trial court improperly precluded her from cross-examining Dr. Bathina with an audit trail from Baptist Health

16

Corbin. According to Crusenberry, the audit trail shows every time and date a patient's medical chart was accessed, who accessed it, what part of the medical chart was accessed, and whether any edits were made to the chart. Crusenberry sought to cross-examine Dr. Bathina during trial with the audit trail in an effort to prove that he only viewed the "face sheet" of her medical chart before discharging her from the hospital. The face sheet includes the patient's name, address, phone number, and other demographic-type information but apparently does not include any medical information for the patient.

Crusenberry began this portion of her cross-examination of Dr. Bathina by asking Dr. Bathina if he knew what an audit trail was. Dr. Bathina said he did not. Crusenberry then began to explain an audit trial to Dr. Bathina, but Dr. Bathina's counsel objected on the basis that the audit trail was not authenticated and Crusenberry's counsel could not testify through his questioning as to what an audit trail was. The trial court sustained the objection because Dr. Bathina did not know what an audit trial was. Crusenberry continued this line of questioning. Dr. Bathina acknowledged that the computer system should in some way show what he looked at in Crusenberry's chart, but again asserted that he did not know anything about an audit trail. Crusenberry's counsel began another question by asking, "Would it surprise you," when Dr. Bathina's counsel objected again on the grounds that Crusenberry had failed to lay a proper foundation and that an expert was needed to explain the audit trail. The trial court sustained the

17

objection but allowed Crusenberry to ask Dr. Bathina if it was true that he had only looked at the face sheet without referencing the audit trail specifically.

Crusenberry argues to this Court that the trial court improperly precluded her from cross-examining Dr. Bathina with the audit trail. She claims she had a good faith basis for cross-examining Dr. Bathina with the audit trail because a Baptist Health witness testified to its accuracy during a discovery deposition. She also argues that no legal basis exists to preclude cross-examination of a witness with impeachment documents merely because that witness is unfamiliar with the document, since this would allow a party to "'bulletproof' his testimony by only familiarizing himself with favorable evidence." Finally, Crusenberry indicates that she could have easily authenticated the document and that she did not intend to admit it as an exhibit.

Baptist Health and Dr. Bathina argue that the trial court did not err in precluding Crusenberry from cross-examining Dr. Bathina with the audit trail for two reasons. First, they argue that Crusenberry failed to authenticate the audit trail, as Dr. Bathina did not know what it was and Crusenberry did not call any other witness to explain the document. Second, they argue that the audit trail was not proper impeachment evidence, as it did not contain any inconsistent statements of Dr. Bathina.

We agree with Baptist Health and Dr. Bathina that the trial court did not abuse its discretion in precluding Crusenberry from cross-examining Dr. Bathina with the audit trail. Even documents that will not be admitted into

18

evidence as exhibits but will only be used in questioning a witness must be authenticated. *See* KRE 901. In this case, Dr. Bathina was unable to authenticate the audit trail, as he did not know what it was. Crusenberry did not call any other witness to authenticate the document. Because Crusenberry did not produce any evidence, witness or otherwise, "to support a finding that the [audit trail] is what [Crusenberry] claim[ed]," the trial court did not err in precluding her use of it in cross-examining Dr. Bathina. *See* KRE 901(a).

Because we have determined the audit trail was properly excluded based on a lack of authentication, we need not determine whether it would have been proper impeachment evidence. However, we note that inconsistent statements of the witness are not the only admissible type of impeachment evidence.

### 4. *Baptist Health Corbin's Corporate Representative*

Paige Harbin was one of Crusenberry's attending floor nurses during her stay at Baptist Health. Harbin was one of three nurses who failed to provide potassium to Crusenberry pursuant to the Potassium Replacement Order. Harbin was Baptist Health's designated representative at trial. There, she testified that she was given a verbal order from Dr. Hienss to withhold potassium, although Dr. Hienss denied giving such an order.

Regarding Harbin's cross-examination, Crusenberry alleges two errors. First, Crusenberry argues that prohibiting a line of questioning regarding how frequently she rehearsed her testimony was an abuse of discretion. Second, Crusenberry argues that prohibiting a further line of questioning regarding her

19

participation in a pretrial internal investigation was an abuse of discretion. We address each allegation in turn.

### a. Questioning the Frequency of Attorney-Client Meetings

While cross-examining Harbin about her knowledge of Baptist Health's corporate structure and location, our review of the record shows the following exchange:

Crusenberry Counsel: Have you been to headquarters in Louisville?

Harbin: Yes, I have.

Crusenberry Counsel: I realize you said you were nervous, but you did an excellent job. Tell the ladies and gentlemen of the jury, how many times have you rehearsed your testimony?

Baptist Health Counsel: Your honor, may we approach the bench?

Baptist Health objected before Harbin answered Crusenberry's counsel's question. At the bench, counsel and the trial court had the following discussion:

Crusenberry Counsel: Nothing wrong with that.

Baptist Health Counsel: That's work product. He can't ask her how many times she's rehearsed. It's work product; attorney work product.

Trial Court: Why do you want it in . . . why do you want to talk about it anyway?

Crusenberry Counsel: Because it was just too perfect, and she's practiced it and rehearsed it and I bet she came—

Baptist Health Counsel: Maybe she's just telling the truth.

Trial Court: Maybe if you say, have you rehearsed it?

Crusenberry Counsel: Okay.

Baptist Health Counsel: Judge, judge, wait, wait, sir, have you rehearsed it and how many times—it's a mistrial. We don't want a mistrial.

Trial Court: Yeah, yeah, you're right. That's not a good question either. We're not at a mistrial yet. But, let's just stay off of that topic.

Crusenberry Counsel: What—can I impeach the party representative that she's rehearsed her testimony? I bet she's come into the courtroom and rehearsed it. I wanna ask her that.

Baptist Health Counsel: No.

Trial Court: I don't think we need to go there. Just take her testimony as it is.

Crusenberry Counsel: Well, I wanna put it in by avowal at some point.

Trial Court: Okay, that's fine.

Dr. Bathina Counsel: Judge, so, so you've overruled—or, you've sustained the motion?

Trial Court: Yes. Not the motion for a mistrial.

Dr. Bathina Counsel: Right.

In sum, Crusenberry believed that by questioning Harbin on this issue, Crusenberry could establish Harbin's bias. Baptist Health objected to this line of questioning, claiming a violation of work product. Baptist Health's objection was sustained. The Court of Appeals determined that while the testimony was not work product protected under CR 26, it was protected testimony under the attorney-client privilege set out in KRE 503.

On appeal to our Court, Baptist Health asserts attorney-client privilege. The attorney-client privilege is a stringent protection of testimonial material. *See St. Luke Hosps., Inc. v. Kopowski,* 160 S.W.3d 771, 777 (Ky. 2005). Under KRE 503, the privilege attaches to confidential communications between clients and lawyers "made for the purpose of facilitating the rendition of professional legal services." (a), (b). The attorney-client privilege enjoys few exceptions. *Id.* at (b), (d). We agree with the Court of Appeals that were a privilege to apply, attorney-client privilege is the better classification for the kind of protection at issue. However, we need not consider the issue. Even if the information sought is not privileged, it still must comport with our rules of evidence regarding an attack on witness credibility.

Crusenberry stated that she intended to impeach Harbin's credibility by showing that her answers were rehearsed. Looking to the Kentucky Rules of Evidence, we must assume that Crusenberry's goal was to attack Harbin's credibility with past conduct.[6] KRE 608(b) outlines the parameters for cross-examining a witness in such a way:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, *if probative of truthfulness or untruthfulness*, be inquired into on cross-examination of the witness . . . . No specific instance of conduct of a witness may be the subject of inquiry under this

---

[6] Although the rule regarding specific instances of past conduct (KRE 608) does not mention impeachment, but rather "attacking . . . the witness' credibility," the Notes to the rule use "impeachment" interchangeably. Rules that mention impeachment explicitly (KRE 407, 609, 613, etc.) are not implicated by Crusenberry's attempted line of questioning.

22

provision *unless the cross-examiner has a factual basis* for the subject matter of his inquiry.

(emphasis added). Therefore, to use an alleged rehearsal to attack Harbin's credibility, the conduct in question must 1) be probative of truthfulness, and 2) stem from a factual basis. Crusenberry has established neither.

Although Crusenberry implies that Harbin was coached in her testimony, her counsel did not state to the trial court any explicit accusation of untruthfulness, nor how his question regarding rehearsal would be probative of truthfulness, or lack thereof. Further, Crusenberry's only basis for the question about Harbin's conduct was that she was "too perfect." Crusenberry attempted to justify a question regarding the witness's prior conduct on speculation alone.

This Court most recently considered the use of KRE 608(b) in *Sims v. Commonwealth*, No. 2020-SC-0097-MR, 2021 WL 2614853, at *5 (Ky. June 17, 2021). There, an attorney sought to attack the credibility of a minor by asking if she had frequently gotten in trouble for lying. *Id.* This Court determined that while the line of questioning regarded truthfulness of a main witness, "[g]iven the absence of legal support for Sims's position and considering the well-recognized principle of evidence prohibiting impeachment on collateral facts," the trial court did not abuse its discretion by prohibiting the question. *Id.*

Here, we have less of an indication that counsel's question was probative of truthfulness than this Court did in *Sims*, where honesty was an element of the question itself. *Id.* Instead, we are left to infer Crusenberry's intent to indicate dishonesty in Harbin's testimony. As noted above, we likewise have no

23

specified factual basis for the alleged rehearsals other than that the witness, in Crusenberry's opinion, was doing too good of a job. This speculation is insufficient to warrant a related attack on Harbin's credibility.

Legal precedent for Crusenberry's attempt is similarly lacking. In support of her claim, Crusenberry cites to *Humana of Kentucky, Inc. v. McKee*, a Court of Appeals decision not binding on this Court. 834 S.W.2d 711 (Ky. App. 1992). In *McKee*, a nurse inaccurately stated the number of times she met with counsel before trial. *Id.* at 721. She had previously disclosed a different number via affidavit. *Id.* On re-direct, McKee impeached the nurse on the issue. *Id.* at 722. Humana alleged on appeal that the impeachment was improper because it concerned a collateral issue. *Id.* at 721. The court determined that the impeachment was proper. *Id.* at 722. The central issue in *McKee*, therefore, was neither attorney-client privilege nor prior conduct; instead, the issue was impeachment with a prior inconsistent statement. Here, by contrast, we have no prior inconsistent statement (nor any factual underpinning). *McKee* is thus unpersuasive.

Having no indication of either probativeness for truth or a factual basis, Crusenberry's question did not comport with the requirements set forth in KRE 608. Accordingly, the trial court's limitation on Crusenberry's ability to cross-examine on testimony rehearsal was not "arbitrary, unreasonable, unfair, or

24

unsupported by sound legal principles." *English*, 993 S.W.2d at 945.[7] We find no error on this issue.

### b. Questioning Harbin's Participation in an Earlier Investigation

Second, Crusenberry claims error because she was prohibited from questioning Harbin's participation in a prior internal hospital investigation related to Crusenberry's injury. Before trial, the court decided that Crusenberry could not ask about any confidential communications between Harbin and the internal investigator (now Baptist Health's attorney). Crusenberry stated that she would only ask whether Harbin had given a written statement; Baptist Health agreed to this limitation. All parties agreed that Crusenberry could not use the internal investigation to impeach Harbin. At trial, Baptist Health objected three times to Crusenberry's phrasing of their agreed-upon question. The judge sustained the objection each time.

Crusenberry now argues that the agreed-upon limitation was error. Baptist Health argues that the issue was not properly preserved because the trial court never ruled against Crusenberry's counsel on the matter other than to limit him to his own suggested question, to which he agreed each time.

---

[7] Regardless, the question would prove relatively unnecessary. Later at trial, Crusenberry questioned Harbin about how long she spent looking at the documents that she was asked to review at trial, claiming that she "must have spent hours" looking over the material. Harbin denies having spent hours reviewing it, but the exchange again served to imply not only Crusenberry's suspicion that Harbin was overly-rehearsed on her testimony, but also showed Crusenberry's ability to elicit such information without asking directly about her frequency of rehearsals with trial counsel.

To review the trial court's ruling, we must first determine whether a sufficient offer of proof was provided. KRE 103 establishes the requirements for review of alleged error:

> (a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected; and

> (1) Objection. If the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; or

> (2) Offer of proof. If the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

In short: "[T]o preserve a trial court's ruling for appeal, a substantial right of the party must be affected and . . . the substance of the excluded testimony must be provided to the trial court." *Henderson v. Commonwealth*, 438 S.W.3d 335, 339 (Ky. 2014). An "offer of proof provides the trial court with a foundation to evaluate properly the objection," so that on appeal, a reviewing court may determine whether a right has been violated by the exclusion of evidence. *Id.* at 340. In the Commonwealth, this requirement is well-established and long predates the latest version of the KRE. *See Tipper v. Commonwealth*, 58 Ky. (1 Met.) 6, 12 (1858).

> The simple refusal to permit an answer to a question is not, of itself, sufficient to show the character of the evidence intended to be elicited by the question. The party excepting to the refusal should, in order to avail himself of the error of the circuit court, state what he expected or believed the witness would prove in response; and let the bill of exceptions show it. Otherwise, this court [cannot] say that the evidence sought by the inquiry was important, or that the refusal to permit an answer was prejudicial to the defendant.

26

*Id.* In other words, without an adequate offer of proof, we cannot determine what other evidence would have been drawn from a witness, and how that evidence related to a substantive right.

In *Henderson v. Commonwealth,* this Court held that offers of proof must "highlight what [a witness] would actually say if given a chance to testify." 438 S.W.3d at 341. There, an attorney made "vague references to the general theory of defense," arguing on appeal that "the excluded testimony was apparent from the context." *Id.* at 340–41. This Court rejected counsel's argument. We held that even if the Court may infer from testimony what the defense strategy may have been, that does not absolve counsel from providing "some modicum of proof." *Id.* at 341.

It is unclear what Crusenberry intended to elicit from Harbin that was limited by the trial court. Both before trial and during trial, each time Crusenberry's counsel was confronted about discussions regarding the investigation, counsel maintained that what he wished to establish was an answer to the agreed-upon question. Crusenberry's counsel did not indicate to the court that he could not do what he wanted to do, and what any other potential evidence would have revealed. We therefore do not even have a vague indication, as we did in *Henderson,* of what precisely Crusenberry's counsel intended to elicit through further questioning—nor what those questions may have been. Accordingly, we find that the trial court did not abuse its discretion in limiting the testimony.

27

### 5. *Medical Journal Article*

Crusenberry next argues that the trial court improperly precluded her from cross-examining Dr. Harold Helderman, a nephrologist[8] and one of Dr. Bathina's expert witnesses, with a medical journal article found in his case file. During Crusenberry's cross-examination of Dr. Helderman, Crusenberry read three portions of a Mayo Clinic article entitled "Rare Incidence of Ventricular Tachycardia and Torsades de Pointes in Hospitalized Patients With Prolonged QT Who Later Received Levofloxacin: A Retrospective Study." This article was in Dr. Helderman's case file because Dr. Helderman had reviewed Dr. Tisdale's deposition, and the article was referred to in Dr. Tisdale's deposition.

After Crusenberry's counsel read the third portion of the article and Dr. Helderman confirmed that he had read it correctly, counsel for Dr. Bathina objected. Dr. Bathina argued that Dr. Helderman was not a cardiologist and therefore was not qualified to testify about the contents of the article. He further argued that the article was not relevant to Dr. Helderman's testimony or his qualifications. Crusenberry, on the other hand, argued that Dr. Helderman produced the article at his deposition, relied upon it, and said it was an authoritative text, and therefore, Crusenberry could read from the article. According to Dr. Helderman's testimony at trial, however, it does not appear that he actually produced the article at his deposition or that he relied upon it but that he merely had it in his case file because he reviewed Dr.

---

[8] Dr. Helderman testified that a nephrologist deals with problems of the kidneys.

Tisdale's deposition and Dr. Tisdale had referred to it. Also, Dr. Helderman never testified at trial that the article was an authoritative text but merely stated that Mayo Clinic articles are generally very reliable. The trial court sustained Dr. Bathina's objection. Crusenberry's counsel requested permission to ask Dr. Helderman what the word "post" means, as that word was used in one of the portions of the article he had already read aloud, but the trial court overruled this request.

Crusenberry argues to this Court that she should have been permitted to read portions of the medical journal article into the record pursuant to KRE 803(18).[9] Specifically, she contends that she was prohibited from reading "the short portion of the journal article which referred to a case study involving a patient who experienced Takotsubo Syndrome *following* a cardiac arrest *caused by* a QT prolonging medication." However, Crusenberry was permitted to read the following sentence before Dr. Bathina's objection: "Two months before the event hospitalization, she had developed post-cardiac arrest takotsubo cardiomyopathy." This was not stricken from the record by the trial court.

Crusenberry does not point this Court to any other portion of the journal article that she wished to read into the record that she was not permitted to

---

[9] KRE 803(18) provides an exception to the hearsay rule for learned treatises. It states, "To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, *established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice*. If admitted, the statements may be read into evidence but may not be received as exhibits." (emphasis added).

read. The article itself was admitted as an exhibit by avowal, but there is no other portion highlighted within the document itself, and Crusenberry does not cite to any part of the video trial record where she orally stated what other portion of the article she wished to read.

As previously explained, under KRE 103(a)(2), "to preserve a trial court's ruling for appeal, . . . the substance of the excluded testimony must be provided to the trial court." *Henderson*, 438 S.W.3d at 339. In this case, Crusenberry made no offer of proof regarding which additional portions of the medical journal article she wished to read aloud during her cross-examination of Dr. Helderman. Accordingly, this issue was not adequately preserved for review, and we decline to hold the trial court abused its discretion on this issue.

**B. Testimony Crusenberry argues was improperly admitted**

*1. Dr. Bathina's Undisclosed Expert Testimony*

Crusenberry claims the trial court erred by permitting expert testimony by Dr. Bathina. Before trial, Crusenberry deposed Dr. Bathina in the presence of his own counsel, who did not disclose him as an expert witness. Instead, that deposition reveals that Dr. Bathina's counsel sought to elicit only fact testimony from Dr. Bathina. Dr. Bathina's counsel indicated that should Dr. Bathina be listed as an expert, he would provide Crusenberry with the opportunity to further depose Dr. Bathina. Dr. Bathina was subsequently listed in Baptist Health's expert witness disclosure. After several emails back and forth, Baptist Health and Dr. Bathina's counsel both declined to provide Dr.

30

Bathina for a further deposition. At a pretrial hearing, the trial court ruled that Dr. Bathina's testimony did not qualify as expert testimony because he would only be testifying to his personal actions, observations, and reasons. Furthermore, Crusenberry admitted that if the testimony was restricted to that which was elicited at the deposition, then she was fine with its admission:

> Bathina's counsel: We will not be asking him to give any expert testimony beyond those personally observed.
>
> Trial Court: So you don't have a problem with that?
>
> Crusenberry's counsel: Not to that; that's the rule.
>
> Trial Court: Well, so if they aren't going to do that, then this motion is moot.

The trial court denied Crusenberry's motion to exclude Dr. Bathina's testimony. A review of the record at trial reveals that Dr. Bathina's given testimony did not exceed the scope of his initial deposition with Crusenberry's counsel. Baptist Health and Dr. Bathina argue on appeal that Crusenberry was adequately apprised of Dr. Bathina's testimony, that Dr. Bathina did not testify as an expert, and that Crusenberry "sat on her rights" and did not seek to compel an additional deposition of Dr. Bathina.

To determine whether Dr. Bathina was used as an expert witness, we first look to the Kentucky Rules of Evidence on opinion testimony by lay witnesses and on expert testimony. *See* KRE 701, 702. KRE 701 serves to limit witnesses not testifying as experts. KRE 702 outlines the appropriate bases for expert testimony. When distinguishing between lay and expert testimony, "the key question . . . is whether [the witness] rendered any opinions that could be

31

deemed 'expert opinions'"—that is to say, whether a witness's testimony is based on personal observation or in a pure reliance on experience and research. *Khani v. Alliance Chiropractic*, 456 S.W.3d 802, 807 (Ky. 2015). Therefore, the character of the evidence "is determined not by asking whether the *witness* is lay or expert, but, instead, by asking whether the *testimony* to be offered is lay." KRE 701 n.1 (Ev. Rules Rev. Comm'n).

In *McDaniel v. Commonwealth*, where a non-party doctor gave opinion testimony regarding two issues after discussing his credentials and experience as a medical professional, this Court determined he acted as an expert witness. 415 S.W.3d 643, 655 (Ky. 2013). However, the Court held that although the doctor acted as an expert, he sufficiently supported his opinion as required by KRE 702, and therefore there was no error. *Id.* Two years later, in *Khani v. Alliance Chiropractic*, this Court held that a chiropractor testifying about the nature and extent of his own chiropractic-related injuries was lay testimony because it stemmed from "Dr. Khani's perceptions of his condition," even though his "perceptions are necessarily filtered through his training and expertise." 456 S.W.3d at 807, 808.

Like Dr. Khani, Dr. Bathina is a party to this action. Dr. Bathina's testimony reveals that he spoke primarily regarding his actions and beliefs stemming from his own experience of the matter being litigated, although, as we recognized in *Khani*, that experience is necessarily mediated by his own training and experience. Further, even if Dr. Bathina's testimony had been that of an expert, by establishing his credentials (as the doctor did in *McDaniel*), a

32

trial court could have found that Crusenberry's rights were not violated by his testimony for violation of KRE 702.

We find no error in the trial court's pretrial reasoning, given Crusenberry's initial access to Dr. Bathina and the testimony ultimately delivered at trial. "The decision to qualify a witness as an expert rests in the sound discretion of the trial court." *Kemper v. Gordon*, 272 S.W.3d 146, 154 (Ky. 2008) (citation omitted). Absent abuse of discretion, we find no error.

### 2. Baptist Health's and Dr. Bathina's Expert Witnesses' Undisclosed Testimony

Crusenberry next argues that the trial court erred in allowing Dr. Katz and Dr. Stacy to give undisclosed expert testimony. At trial, both expert witnesses admitted to testifying to opinions they had developed only one day prior to their testimony. The first, Dr. Katz, testified that admitting Crusenberry to a nursing home or facility would cost approximately $80,000 annually, whereas hiring a licensed nurse as an aid for Crusenberry would cost approximately $120,000. Dr. Katz did not disclose these numbers prior to trial because he had calculated them based off current rates the day before he was called to testify. However, as Baptist Health's damages expert, Dr. Katz's disclosure did state that he would testify to "Ms. Crusenberry's professional needs."

The second witness, Dr. Stacy, reviewed various echocardiograms during his testimony. Previously, he stated that his opinions had been based on written reports only. He had gained access to the images the day before he was called to testify, and so his image-based interpretations were developed after

his deposition was taken. However, at his deposition, Dr. Stacy told Crusenberry that he would review the echocardiograms before trial. Dr. Stacy's opinions did not change as a result of having the images.[10]

In her reply brief to this Court, Crusenberry concedes that because "these undisclosed opinions involve causation and damages, [] any error would likely be harmless error." Given this concession and our holdings that no other issues raised reversible error, we decline to address the merits of this argument, as any error, if it exists, would be harmless, since the jury never reached the issues of causation or damages.

### C. Jury Instruction

Crusenberry next argues that the trial court's jury instruction regarding the duty Baptist Health owed to Crusenberry improperly limited and prejudicially misstated the hospital's legal duty. Crusenberry tendered and requested the following jury instruction regarding the hospital's duty: "It was the duty of the defendant, Baptist Health and its employees to exercise towards Kali Crusenberry that degree of care and skill ordinarily expected of reasonable and prudent hospitals under similar circumstances." Baptist Health argued to the trial court that the instruction should include the phrase "by and through its nursing staff," as Crusenberry's proof only bore on the actions of the nurses. The instruction eventually given to the jury by the trial court was as follows, "It was the duty of the Defendant, Baptist Healthcare System, Inc.,

---

[10] Additionally, Crusenberry's own expert witness, Dr. Charash, had not viewed the echocardiograms at his deposition but testified regarding the images at trial.

d/b/a Baptist Health Corbin, to exercise toward Kali Crusenberry that degree of care and skill ordinarily expected of reasonable and prudent hospitals by and through its nursing staff, under similar circumstances." Crusenberry claims that this jury instruction improperly "limited the jury's consideration of the evidence and prohibited the jury from considering the full scope of the hospital's duty."

Crusenberry further argues that this Court should review the jury instructions de novo while Baptist Health argues the instruction should be reviewed for abuse of discretion. In *Sargent v. Shaffer*, 467 S.W.3d 198, 202–04 (Ky. 2015), we explained that there are two types of instructional errors and that each type is reviewed under a different standard. When the alleged error is that a trial court either gave an instruction that was not supported by the evidence or failed to give an instruction that was required by the evidence, the correct standard of review is abuse of discretion. *Id.* at 203. This is because the

> decision to give or to decline to give a particular jury instruction inherently requires complete familiarity with the factual and evidentiary subtleties of the case that are best understood by the judge overseeing the trial from the bench in the courtroom. Because such decisions are necessarily based upon the evidence presented at the trial, the trial judge's superior view of that evidence warrants a measure of deference from appellate courts that is reflected in the abuse of discretion standard.

*Id.* However, when the alleged error is that the text of the jury instruction did not accurately present the applicable legal theory, we review the instruction de novo. *Id.* at 204. This is because "the trial court has no discretion to give an instruction that misrepresents the applicable law." *Id.*

35

Although we conclude that the error alleged in this case is whether the evidence supported an instruction regarding the hospital's independent negligence more broadly than just through the conduct of the nursing staff, which thereby mandates an abuse of discretion standard of review, we feel compelled to address Crusenberry's claim that the instruction as given by the trial court did not comply with this Court's bare bones jury instruction jurisprudence.

This Court and its predecessor Court have long held that jury instructions "should provide only the bare bones, which can be fleshed out by counsel in their closing arguments." *Cox v. Cooper*, 510 S.W.2d 503, 535 (Ky. 1974). In *Rogers v. Kasdin*, heavily relied upon by Crusenberry, we applied this rule to a jury instruction regarding a hospital's duty to a patient. 612 S.W.2d 133 (Ky. 1981). In that case, the trial court not only instructed the jury that the hospital had a duty "to exercise that degree of care ordinarily used by hospitals under circumstances like or similar to those shown in this case" but also instructed the jury that the hospital had six additional and detailed duties. *Id.* at 135. As an example, one of the six additional duties that the trial court instructed the jury was owed to hospital patients was the duty to "[m]aintain procedures appropriate and adequate to determine whether the nurses and the staff of the hospitals were maintaining adequate medical records which would enable the patient to receive effective continuing care as would enable a physician or other practitioner to assume the care of the patient at any time." *Id.* at 135–36.

We reiterated that jury instructions "should not contain an abundance of detail" and held that the instruction given to the jury in that case was "improper and prejudicial," warranting reversal. *Id.* at 136. We noted two primary concerns with the amount of detail provided in the jury instruction. First, the instruction gave "undue prominence to facts and issues," and second, "[t]he effect of the instruction was to demand more of the hospital than the law requires." *Id.* (citations omitted). We then provided "[a] more satisfactory instruction on the issue of the hospital's duty of ordinary care":

> It was the duty of the defendant [hospital] and its employes [sic] to exercise toward [the plaintiff] that degree of care and skill ordinarily expected of reasonable and prudent hospitals under similar circumstances. If you are satisfied from the evidence that they failed to comply with that duty and that such failure on their part was a substantial factor in causing the death of [the plaintiff], you will find for the plaintiff against [the hospital]; otherwise you will find for [the hospital].

*Id.* Although we described this instruction as "more satisfactory," we did not state that it was the only acceptable instruction regarding a hospital's duty of care.

The instruction given by the trial court in the case at bar did not implicate the two concerns as described by the *Rogers* Court. Merely adding the phrase "by and through its nursing staff" to the instruction propounded by the *Rogers* Court did not give "undue prominence to facts and issues" and did not "demand more of the hospital than the law requires." *See id.* Instead, the inclusion of that phrase tailored the instruction to the proof as presented at trial and did not violate our bare bones jury instruction jurisprudence.

37

Having determined that the instruction accurately presented the law to the jury, we must determine whether the trial court abused its discretion in limiting the instruction to the nurses' actions based on the proof at trial. We hold that it did not.

Crusenberry argues, in essence, that the hospital, as a brick and mortar institution, independently breached the duty of care it owed to Crusenberry. "The trial court must instruct the jury upon every theory reasonably supported by the evidence." *Sargent*, 467 S.W.3d at 203. However, a party is only "entitled to an instruction upon his theory of the case if there is evidence to sustain it." *Id.* (citation omitted). Although it is "perfectly acceptable" for the giving of an instruction to "rest[] largely upon inferences and circumstantial evidence," *Univ. Med. Ctr., Inc. v. Beglin*, 375 S.W.3d 783, 792 (Ky. 2011), there still must be sufficient evidence elicited upon which a jury can make reasonable inferences. In this case, it was not an abuse of discretion for the trial court to conclude that insufficient evidence existed upon which the jury could reasonably infer that Baptist Health breached its duty to Crusenberry in any way other than through its nursing staff.

"Under Kentucky law, a plaintiff alleging medical malpractice is generally required to put forth expert testimony to show that the defendant medical provider failed to conform to the standard of care." *Blankenship v. Collier*, 302 S.W.3d 665, 670 (Ky. 2012) (citing *Perkins v. Hausladen*, 828 S.W.2d 652, 655–56 (Ky. 1992)). Crusenberry focused the presentation of her case on the alleged negligence of the nurses as presented through the expert testimony of Dr.

38

Laura McIlvoy. Dr. McIlvoy testified that the nurses in question violated five hospital policies and failed to adequately follow doctors' orders three times.

Crusenberry points to absolutely no testimony regarding the standard of care the *hospital* was required to meet nor testimony that clearly stated the *hospital* failed to meet that standard of care.[11] Instead, she argues that the nurses' violations of the hospital's policies and procedures allowed for an inference that the hospital breached its duty. However, this Court has previously held that a hospital's internal policies and procedures, in and of themselves, do not establish the standard of care. *See Lake Cumberland Reg'l Hosp., LLC v. Adams*, 536 S.W.3d 683, 696 (Ky. 2017). Crusenberry offered no testimony that indicated whether Baptist Health's policies and procedures were equivalent to the "degree of care and skill ordinarily expected of reasonable and prudent hospitals under similar circumstances" or higher or lower than this standard of care. Without this testimony, Crusenberry failed to produce evidence to support her theory that the hospital violated its duty to her separate from the actions of the nurses. Accordingly, the trial court did not abuse its discretion in limiting the jury instruction to the nurses' conduct.

---

[11] We note that this was an eleven-day jury trial. Kentucky Rule of Civil Procedure 76.12(4)(c)(v) requires a party include "ample supportive references to the record" in the argument section of her brief. As such, we focused our review on the portions of the trial cited in Crusenberry's brief in support of her argument but went beyond such as necessary.

**D. Cumulative Error**

After thorough review of each claim presented to this Court, we have found no prejudicial errors. Accordingly, we find no cumulative error worthy of reversal. *See Brown*, 313 S.W.3d at 631 (holding that where "none of the errors individually raised any real question of prejudice," there is no cumulative error).

## IV.   CONCLUSION

For the foregoing reasons, we affirm the Court of Appeals.

Minton, C.J.; Conley, Hughes, and VanMeter, JJ., concur. Lambert, J., concurs in part and dissents in part without opinion.  Nickell, J., not sitting.

COUNSEL FOR APPELLANTS, KENTUCKY GUARDIANSHIP ADMINISTRATORS, LLC, AS CONSERVATOR FOR KALI CRUSENBERRY; AND LOUISE YOUNT, AS GUARDIAN FOR KALI CRUSENBERRY:

Richard Wayne Hay
Sarah Hay Knight
Hay & Knight, PLLC

COUNSEL FOR APPELLEE, BAPTIST HEALTHCARE SYSTEM, INC. D/B/A BAPTIST HEALTH CORBIN:

Melanie Sublett Marrs
Kinkead & Stilz, PLLC

Justin Tyler Baxter
Quintairos Prieto Wood & Boyer, PA

Wesley Ray Tipton
Tipton & Tipton Attorneys

Andrew C. Efaw
Wheeler Trigg O'Donnell, LLP

COUNSEL FOR APPELLEES, APOGEE MEDICAL GROUP, KENTUCKY, P.S.C. AND SUBHOSE BATHINA, M.D.:

Mark Edward Nichols
Jeffrey Alan Darling
Nichols Walter, PLLC

Elizabeth Anne Arrick
Casey Bailey & Maines, PLLC